# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

## HIGHLY CONFIDENTIAL-TO BE FILED UNDER SEAL
### SUBJECT TO PROTECTIVE ORDER

IN RE THALOMID AND REVLIMID
LITIGATION

Civil No.  14-6997 (MCA) (MAH)

## CLASS PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION AND
## APPOINTMENT OF CLASS COUNSEL

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   ARGUMENT .........................................................................................................5

    A.    THE CLASS IS ASCERTAINABLE ............................................................5

        1.    Plaintiffs' Proposed Method for Ascertaining Whether a Payment Was Made in a Damages Class State....................................................................8

    B.    PLAINTIFFS HAVE DEMONSTRATED THAT COMMON QUESTIONS PREDOMINATE IN SATISFACTION OF RULE 23(b)(3) ........................9

        1.    Celgene Has Failed to Rebut Plaintiffs' Showing that Substantially All Class Members Were Injured ......................................................................10

            a.    Plaintiffs Already Accounted for the Existence of Potential Brand Loyalists......12

            b.    Plaintiffs Accounted for Patients Who Received Co-Pay Assistance ...................15

            c.    The Existence of Plan Maximums Does Not Defeat Class Certification ............17

            d.    The Other Unproven Hypotheticals Dr. Hughes Invented Do Not Defeat Class Certification........................................................................18

            e.    Stop-Loss Insurance and PBM Rebates Are Irrelevant Because Impact Occurs When Class Members Overpaid for Thalomid and Revlimid .....19

        2.    The Proposed Damages Methodology Results in a Reliable Class-Wide Estimate.................................................................................20

        3.    Common Proof of Plaintiffs' State Law Claims Predominates ...........................24

            a.    There Are No Material Variations Among the Unjust Enrichment State Laws ...........................................................25

            b.    There Are No Material Variations in the Consumer Protection State Laws ........28

    C.    DAVID MITCHELL HAS STANDING TO BRING HIS CLAIMS .....................30

        1.    Mr. Mitchell Has Standing to Pursue Claims Under District of Columbia Law ...........................................................30

        2.    Mr. Mitchell Has Standing to Seek an Injunction......................................................32

    D.    THE PROPOSED INJUNCTION CLASS IS NOT SEEKING MONETARY RELIEF AND SHOULD BE CERTIFIED UNDER RULE 23(b)(2)....................33

III.  CONCLUSION ...................................................................................................35

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) (*per curiam*) ................................................................5

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997) ......................................................................................................10

*Anastasia v. Barnes*,
    127 Misc. 2d 971, 487 N.Y.S.2d 628 (1985) ..............................................................24

*Astiana v. Hain Celestial Group, Inc.*,
    783 F.3d 753 (9th Cir. 2015) .......................................................................................26

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
    242 F.3d 290 (5th Cir. 2001) .......................................................................................14

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir .1975) .......................................................................................14

*Bogosian v. Gulf Oil Corp.*,
    561 F.2d 434 (3d Cir. 1977) .............................................................................14, 16, 22

*Bourgeois v. Live Nation Entm't, Inc.*,
    3 F. Supp. 3d 423 (D. Md. 2014) ................................................................................32

*Bushong v. Park*,
    837 A.2d 49 (D.C. App. 2003) ....................................................................................24

*Byrd v. Aaron's Inc.*,
    784 F.3d 154 (3d Cir. 2015) ...........................................................................5, 7, 8, 21

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013) .......................................................................................6, 7

*Castro v. Sanofi Pasteur*,
    134 F. Supp. 3d 820 (D.N.J. 2015) .......................................................................*passim*

*City Select Auto Sales Inc. v. BMW Bank of N. Am., Inc.*,
    867 F.3d 434 (3d Cir. 2017) ..........................................................................2, 5, 6, 15

*Cohen v. Chicago Title Ins. Co.*,
    242 F.R.D. 295 (E.D. Pa. 2007) .................................................................................34

*Colvin v. Goldenberg*,
   273 A.2d 663 (R.I. 1971) ......................................................................................24

*Cox v. Microsoft Corp.*,
   778 N.Y.S.2d 147 (N.Y. App. Div. 2004)..............................................................27

*Easterling v. Connecticut Dep't of Correction*,
   278 F.R.D. 41 (D. Conn. 2011) ............................................................................34

*Fickle v. State*,
   274 Neb. 267, 759 N.W.2d 113 (2007) ................................................................24

*Fla. Power Corp. v. City of Winter Park*,
   887 So.2d 1237 (Fla. 2004) ..................................................................................26

*Fye v. Kennedy*,
   991 S.W.2d 754 (Tenn. Ct. App. 1998) ................................................................24

*George v. Nat'l Water Main Cleaning Co.*,
   286 F.R.D. 168 (D. Mass. 2012) ..........................................................................30

*Grandalski v. Quest Diagnostics*,
   767 F.3d 175 (3d Cir. 2014)..................................................................................22

*Gutteridge v. J3 Energy Grp., Inc.*,
   No. 3397 EDA 2013, 2017 WL 2402832 (Pa. Super. Ct. May 17, 2017).............26

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) .........................................................................................12

*Harnish v. Widener University School of Law*
   833 F.3d 298 (3d Cir. 2016...................................................................................12

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*,
   353 P.3d 319 (Cal. 2015) ......................................................................................26

*Hawaii v. Standard Oil Co.*,
   405 U.S. 251 (1972)..............................................................................................20

*Hayes Sight & Sound, Inc. v. ONEOK, Inc.*,
   281 Kan. 1287, 136 P.3d 428 (2006) ...................................................................24

*Hoitt v. Hall*,
   661 A.2d 669 (Me. 1995)......................................................................................24

*In re Capacitors Antitrust Litig.*,
   154 F. Supp. 3d 918 (N.D. Cal. 2015)..................................................................31

*In re Cardizem CD Antitrust Litig.*,
    105 F. Supp. 2d 618 (E.D. Mich. 2000) ................................................27

*In re Cardizem CD Antitrust Litigation*,
    200 F.R.D. 326 (E.D. Mich. 2001) ......................................................22

*In re Cmty. Bank of N. Va. Mortg. Lending Practices*,
    795 F.3d 380 (3d Cir. 2015) ..................................................................7

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
    903 F. Supp. 2d 198 (S.D.N.Y. 2012) ..................................................29

*In re Deepwater Horizon*,
    739 F.3d at 815 & n. 104, (5th Cir. 2014) ............................................22

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) ................................................31

*In re Flash Memory Antitrust Litig.*,
    No. 07–0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ..................34

*In re Flonase Antitrust Litig.*,
    284 F.R.D. 207 (E.D. Pa. 2012).................................................... 22, 35

*In re Flonase Antitrust Litig.*,
    692 F. Supp. 2d 524 (E.D. Pa. 2010)................................................9, 30

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ......................................................27

*In re Lidoderm Antitrust Litigation*,
    No. 14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ....................................*passim*

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002) ................................................................20

*In re Magnesium Oxide Antitrust Litig.*,
    No. 10-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011)......................31

*In re Modafinil Antitrust Litig.*,
    837 F.3d 238 (3d Cir. 2016), *as amended* (Sept. 29, 2016) ................21

*In re Neurontin Antitrust Litig.*,
    No. 02-1830, 2011 WL 286118 (D.N.J. Jan. 25, 2011)......................2, 10

*In re New Jersey Title Ins. Litig.*,
    683 F.3d 452 (3d Cir. 2012) ................................................................33

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) ................................................................................*passim*

*In re Nexium (Esomeprazole) Antitrust Litigation*,
  297 F.R.D. 168 (D. Mass. 2013) ......................................................................*passim*

*In re Niaspan Antitrust Litig.*,
  42 F. Supp. 3d 735 (E.D. Pa. 2014) ............................................................................ 9

*In re OSB Antitrust Litig.*,
  No. 06-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) .......................................... 3

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  No. 06-1782, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017) ...................................... 22

*In re Processed Egg Products Antitrust Litig.*,
  321 F.R.D. 555 (E.D. Pa. 2017) ............................................................................... 33

*In re Processed Egg Products Antitrust Litig.*,
  312 F.R.D. 171 (E.D. Pa. 2015) ......................................................................*passim*

*In re Propranolol Antitrust Litig.*,
  249 F. Supp. 3d 712 (S.D.N.Y. 2017) ....................................................................... 27

*In re Relafen Antitrust Litigation*,
  221 F.R.D. 260 (D. Mass. 2004) ......................................................................... 14, 33

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
  No. 14-md-02503, 2017 WL 4621777 (Oct. 16, 2017) .....................................*passim*

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
  64 F. Supp. 3d 665 (E.D. Pa. 2014) ..................................................................... 29, 31

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, 2011 WL 4501223 (N.D. Cal. Sept. 28, 2011) ..................... 26, 27

*In re Vitamin C Antitrust Litig.*,
  279 F.R.D. 90 (E.D.N.Y. 2012) ............................................................................... 34

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) .................................................................................................. 21

*Jermyn v. Best Buy Stores, L.P.*,
  276 F.R.D. 167 (S.D.N.Y. 2011) ............................................................................. 34

*Johnson v. MetLife Bank, N.A.*,
  883 F. Supp. 2d 542 (E.D. Pa. 2012) ....................................................................... 30

*Kohen v. Pac. Inv. Mgmt. Co. LLC,*
 571 F.3d 672 (7th Cir. 2009) ....................................................................................17

*Law v. Griffith,*
 457 Mass. 349, 930 N.E.2d 126 (2010) ....................................................................24

*Lopes v. Commonwealth,*
 811 N.E.2d 501 (Mass. 2004) ...................................................................................26

*Lund v. San Joaquin Valley R.R.,*
 31 Cal. 4th 1, 1 Cal. Rptr. 3d 412, 71 P.3d 770 (2003) ...........................................24

*Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.,*
 817 F.3d 241 (5th Cir. 2016) ....................................................................................32

*Marcus v. BMW of North America, LLC,*
 687 F.3d 583 (3d Cir. 2012) .......................................................................................6

*McNair v. Synapse Group Inc.,* 672 F.3d 213 (3d Cir. 2012) ............................................32

*Melton v. Century Arms, Inc.,*
 243 F. Supp. 3d 1290 (S.D. Fla. 2017) .....................................................................27

*Messner v. Northshore Univ. HealthSystem,*
 669 F.3d 802 (7th Cir. 2012) ...........................................................................5, 11, 13

*Metro. Life Ins. Co. v. Cotter,*
 984 N.E.2d 835 (Mass. 2013) ...................................................................................26

*Mid-West Paper Prod. Co. v. Cont'l Grp., Inc.,*
 596 F.2d 573 (3d Cir. 1979) ......................................................................................33

*Neale v. Volvo Cars,*
 794 F.3d 353 (3d Cir. 2015) ............................................................................1, 22, 29

*Nepomuceno v. Midland Credit Mgmt., Inc.,*
 Case No. 14-05719, 2016 WL 3392299 (D.N.J. June 13, 2016) .................................8

*Newton v. Merrill Lynch,* 259 F.3d 154 (3d Cir. 2001) ...............................................12

*Raffin v. Medicredit, Inc.,*
 No. 15-4912, 2017 WL 131745 (C.D. Cal. Jan. 3, 2017) .........................................34

*Robert E. Owen & Assocs. v. Gyongyoski,*
 433 So. 2d 1023 (Fla. Dist. Ct. App. 1983), *petition for review denied* 444 So. 2d 417
 (Fla. 1984) .................................................................................................................24

*Seekamp v. It's Huge, Inc.,*
 No. 09-00018, 2012 WL 860364 (N.D.N.Y. Mar. 13, 2012) ...................................34

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,*
  737 F. Supp. 2d 380 (E.D. Pa. 2010)..................................................................29

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,*
  No. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ...............................13

*Sheet Metal Workers Local 441 Health and Welfare Plan v. GlaxoSmithKline PLC,*
  263 F.R.D. 205 (E.D. Pa. 2009) .........................................................................27

*Simler v. Conner,*
  372 U.S. 221 (1963)............................................................................................29

*Smilow v. S.W. Bell Mobile Sys., Inc.,*
  323 F.3d 32 (1st Cir. 2003) ................................................................................14

*Smith v. Chrysler Fin. Co.*
  No. 00-6003, 2004 WL 3201002, at *4 (D.N.J. Dec. 30, 2004)..........................32

*Sperry v. Crompton Corp.,*
  863 N.E.2d 1012 (N.Y. 2007) ............................................................................27

*State of Fla., Office of Atty. Gen., Dept. of Legal Affairs v. Tenet Healthcare Corp.,*
  420 F. Supp. 2d 1288 (S.D. Fla. 2005) ...............................................................25

*State ex rel. Redden v. Disc. Fabrics, Inc.,*
  289 Or. 375 (1980) .............................................................................................29

*Sullivan v. DB Invs., Inc.,*
  667 F.3d 273 (3d Cir. 2011) ...............................................................................10

*Taghadoss v. Bank of Am., N.A.,*
  No. 17-1894, 2017 WL 6536581 (M.D. Fla. Dec. 21, 2017)..............................26

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,*
  546 F.3d 196 (2d Cir. 2008)..................................................................................5

*Tebo v. Havlik,*
  418 Mich. 350, 343 N.W.2d 181 (1984)..............................................................24

*Titchnel v. United States,*
  681 F.2d 165 (3d Cir. 1982)................................................................................24

*United States v. Glaxo Grp. Ltd.,*
  410 U.S. 52 (1973)..............................................................................................34

*Vista Healthplan, Inc. v. Cephalon, Inc.,*
  No. 2:06-CV-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015) ...................6, 15

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) .................................................................................34

*Waste Mgmt. Holdings, Inc. v. Mowbray,*
    208 F.3d 288 (1st Cir. 2000) ...................................................................28

*Weiss v. New York Hosp.,*
    745 F.2d 786 (3d Cir. 1984) ...................................................................34

*White v. Jubitz Corp.,*
    347 Or. 212, 219 P.3d 566 (2009) ..........................................................24

*White v. Lowery,*
    352 S.E.2d 866 (N.C. Ct. App. 1987) .....................................................24

*Wilson v. County of Gloucester,*
    256 F.R.D. 479 (D.N.J. 2009) .................................................................34

## Rules

Fed. R. Civ. P. 23 ........................................................................................15

Fed. R. Civ. P.  23(a) .....................................................................................1

Fed. R. Civ. P.  23(b) .............................................................................. 10, 13

Fed. R. Civ. P.  23(b)(2) ....................................................................33, 34, 35

Fed. R. Civ. P.  23(b)(3) ........................................................................*passim*

Fed. R. Civ. P. 23(c)(1)(C) ..........................................................................25

## Other Authorities

Daniel R. Karon, *Undoing The Otherwise Perfect Crime – Applying Unjust Enrichment to*
    *Consumer Price-Fixing Claims*, 108 W. Va. L. Rev. 395, 409 (Winter 2005) .........................25

Restatement (Second) of Torts, § 920A(2) ..................................................24

## I. INTRODUCTION

Plaintiffs seek class certification to advance their case against Celgene, whose conduct has successfully prevented generic alternatives to Thalomid and Revlimid from coming to market for more than seven years. Indeed, on May 17, 2018, the FDA released a list of brand name drug manufacturers who have been the subject of complaints by generic drug manufacturers – Celgene topped the list.[1] In its opposition, Celgene concedes that Plaintiffs meet all the requirements of Rule 23(a), and that a class action is superior to thousands of separate lawsuits, as required by Rule 23(b)(3). Celgene also does not dispute that common questions predominate over individualized questions of liability, or that generic Thalomid and Revlimid would be less expensive than their brand counterparts. The remaining questions for the Court to resolve are: (1) whether the classes are ascertainable when they are objectively defined, and where class members, pharmacies, and Celgene itself have records identifying class members; (2) whether common questions predominate under Rule 23(b)(3), where all questions as to Celgene's liability are common, and Celgene has failed to rebut Plaintiffs' evidence that substantially all class members were impacted; and (3) whether the nationwide Injunction Class should be certified when the majority of its members seek *only* injunctive relief.[2]

████████████████████████████████████████████████

---

[1] Ex. 110, Reference Listed Drug (RLD) Access Inquiries, U.S. Food and Drug Administration, https://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelopedandApproved/ApprovalApplications/AbbreviatedNewDrugApplicationANDAGenerics/ucm607738.htm ("FDA is committed – among other things – to addressing and improving transparency about this and other gaming tactics that delay the generic competition Congress intended."); Ex. 111, F.D.A. Names and Shames Drug Makers to Encourage Generic Competition, *The New York Times* (May 17, 2018), https://www.nytimes.com/2018/05/17/health/drug-prices-generics-fda.html.

[2] Celgene also argues that Plaintiffs' aggregate damages model is unreliable. As explained in section II.B.2, Dr. Leitzinger used a common and reliable method to determine class-wide damages; however, even if damages were an individualized inquiry, this would not be a sufficient basis to defeat certification of the class. *See, e.g., Neale v. Volvo Cars*, 794 F.3d 353, 374-75 (3d Cir. 2015) (holding that individualized damages inquiry not sufficient to defeat class certification). Finally, although David Mitchell is an appropriate representative of all three classes (*see* section II.C *infra*), his standing or adequacy as a class representative does not bear on whether the classes should be certified, as Celgene does not contest the adequacy of the other proposed representatives.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█ █████████████████████████████████████████████████████

████████████ █ ████████████████████████████████████████ █

Much of Celgene's opposition to class certification centers on Dr. Hughes's claim that

pharmacy benefit managers ("PBMs") could be class members. Hughes Decl. ¶ 10. But as Dr.

Leitzinger explained one month before Celgene filed its opposition, PBMs are not class members.

Celgene Opp. at 15 (citing Opp. Ex. 3, Leitzinger Dep. at 131:22-132:9). PBMs process prescription

drug claims as intermediaries between third-party payors ("TPPs") and pharmacies. DeBree Decl. ¶

38.[6] PBMs do not pay for prescription drugs. DeBree Decl. ¶ 38.[7] Dr. Hughes disagreed, opining that

---

[3] ████████████████████████████████████████████
██████████████████████████████████████████████████ *In re Nexium (Esomeprazole) Antitrust*
*Litigation*, 297 F.R.D. 168, 184 (D. Mass. 2013) (certifying end payor class despite Dr. Hughes's
opinion); *In re Lidoderm Antitrust Litigation*, No. 14-md-02521-WHO, 2017 WL 679367, at *31 (N.D.
Cal. Feb. 21, 2017) (same); *In re Neurontin Antitrust Litig.*, No. 02-1830, 2011 WL 286118, at *8-9
(D.N.J. Jan. 25, 2011) (same).

[4] ████████████████████████████████████████████████████████
█ █████████████████████████████████████████████████████████
███████████████████████████████████████████ *City Select Auto Sales Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 441 (3d Cir.
2017) (class membership can be verified using affidavits); Ex. 112, Hughes Dep. 34:20-35:5 (defining
ascertainability as whether class members were injured and can be identified).

[6] To respond to certain arguments made by Dr. Hughes, Plaintiffs submit an expert declaration from
W. Paul DeBree. Mr. DeBree has been involved in the PBM industry for more than twenty years
and has expertise in "PBM contracting, payment flows, rebates, rebate contract billing, plan design,
pharmacy network development and management, recordkeeping, and other services that PBMs
perform for their customers." DeBree Decl. ¶¶ 2, 4.

[7] *See also* DeBree Decl. ¶ 41 ("The retail price for Thalomid and Revlimid is paid solely by the TPP
and its beneficiary."); *id.* at ¶ 40 ("Based on my personal PBM contract experience and knowledge of
industry practice, it is my opinion that PBMs using the ASO model are not themselves paying for
prescription drugs – they are facilitating payments by TPPs. Dr. Hughes's statement to the contrary
is unsupported conjecture, and wrong.").

PBMs could be class members because they may have "absorbed some of the loss" by paying a pharmacy more for a drug than the third-party payor. Celgene Opp. at 22-23; Hughes Decl. ¶¶ 35, 73;

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████.[8]

In any event, to avoid confusion, Plaintiffs propose expressly excluding PBMs from the class definitions. *See Nexium*, 297 F.R.D. at 179 (addressing Dr. Hughes's erroneous contention that PBMs fell under the class definition by explicitly excluding PBMs from the class); *see also Lidoderm,* 2017 WL 679367, at *20-21 (rejecting Dr. Hughes's argument that PBM involvement in the pharmaceutical marketplace may have eliminated impact to third-party payor class members). And because Dr. Hughes made a similar error as to stop-loss insurers, Plaintiffs propose adding an explicit exclusion for them as well.[9] The revised class definitions follow:[10]

The "Antitrust/Consumer Protection Damages Class" (under Rule 23(b)(3)):

All persons or entities who purchased and/or paid for some or all of the purchase price for thalidomide in any form after November 6, 2010 or lenalidomide in any form after December 28, 2012, in California, the District of Columbia, Florida, Kansas, Maine, Massachusetts, Michigan, Nebraska, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, or Tennessee, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries.

---

[8] ██████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████ DeBree Decl. ¶ 16 ("[a]dministratively, each claim is electronically sent to the PBM from the retail pharmacy, invoiced to the TPP by the PBM, and *upon receipt of TPP payment*, paid to the pharmacy.").
[9] Neither of these exclusions are necessary for class certification, but if the Court finds that adding these exclusions assists with ascertainability, eliminating the potential for uninjured class members, or reducing class confusion, the classes should be certified with these explicit exclusions.
[10] In addition, Plaintiffs have adopted a more conservative class "start date" for lenalidomide purchasers, following Mr. Molina's Supplement to his report, filed November 30, 2017 (predicting generic Revlimid would have been available December 28, 2012, rather than January 29, 2011).

The "Unjust Enrichment Damages Class" (under Rule 23(b)(3)):

All persons or entities who purchased and/or paid for some or all of the purchase price for thalidomide in any form after November 6, 2010 or lenalidomide in any form after December 28, 2012, in California, the District of Columbia, Florida, Kansas, Maine, Massachusetts, Michigan, Nebraska, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, or Tennessee, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries.

The "Injunction Class" (under Rule 23(b)(2)):

All persons or entities who purchased and/or paid for some or all of the purchase price for thalidomide in any form after November 6, 2010 or lenalidomide in any form after December 28, 2012, in the United States or its territories for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries.

Excluding the following persons or entities:

   a.  Defendant and their officers, directors, management, employees, subsidiaries, or affiliates;

   b.  Government entities, except for government-funded employee benefit plans;

   c.  All persons or entities who purchased Revlimid or Thalomid for purposes of resale or directly from Defendant or their affiliates;

   d.  Fully insured health plans (*i.e.*, Plans that purchased insurance from another third-party payor covering 100% of the Plan's reimbursement obligations to its members);

   e.  "Single flat co-pay" consumers who purchased Revlimid or Thalomid only via a fixed dollar co-payment that does not vary on the basis of the purchased drug's status as branded or generic (*e.g.*, $20 for both branded and generic drugs);

   f.  Pharmacy benefit managers;

   g.  Stop-loss insurers;

   h.  The judges in this case and any members of their immediate families.

Through their motion papers and expert reports, Plaintiffs demonstrated why the Court should certify

the Classes, and Celgene has failed to rebut Plaintiffs' showing. *See In re Nexium Antitrust Litig.*, 777

F.3d 9, 27 (1st Cir. 2015) (once plaintiffs have made initial showing for class certification by a

preponderance of the evidence, defendants bear burden of producing sufficient evidence to rebut

that showing) (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012);

4

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir. 2008)); *accord*

*Alaska Elec. Pension Fund v. Flowserve Corp.,* 572 F.3d 221, 228 (5th Cir. 2009) (*per curiam*).

## II.  ARGUMENT

### A.  THE CLASS IS ASCERTAINABLE

A class is ascertainable if it is (1) defined with reference to objective criteria, and (2) there is a "reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). Celgene does not contest the objective nature of the class definition; it focuses on whether identification of class members is administratively feasible.

Celgene complains that Plaintiffs have not "identif[ied] what entities or consumers are members of the classes." Celgene Opp. at 14. But the Third Circuit has held that plaintiffs are not required to have an exhaustive list of every class member in order to get a class certified. *City Select Auto Sales Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 441 (3d Cir. 2017) ("Plaintif[s] need not, at the class certification stage, demonstrate that a single record, or set of records, conclusively establishes class membership."); *Byrd*, 784 F.3d at 163 (ascertainability requirement "does not mean that a plaintiff must be able to identify all class members at certification").

In *City Select*, the plaintiffs alleged that the defendants violated the Telephone Consumer Protection Act by sending junk faxes to class members. The defendants had a database of *potential* class members, but did not know which subset had been sent the junk faxes (and thus, which identities in the database were class members). The district court denied certification, because "there [was] no objective way of determining which customers were actually sent the [faxes]" using the database alone. 867 F.3d at 438. The Third Circuit vacated and remanded, holding that "Plaintiff need not, at the class certification stage, demonstrate that a single record, or set of records, conclusively establishes class membership," and "[t]o the extent [the District Court's] conclusion was based on a categorical

determination that [a] database in combination with affidavits from potential class members could never satisfy the ascertainability standard, we disagree." *Id.* at 441. The Court held that while affidavits alone, without a method to "weed out unreliable affidavits," may be insufficient, "*Marcus* and our other cases do not imply *no* level of inquiry as to the identity of class members can ever be undertaken." *Id.*[11]

As to individual consumer class members, there is no dispute that, unlike in *Wellbutrin* and *Vista Healthplan*, (district court cases relied on by Celgene in its opposition, involving drugs <u>not</u> subject to REMS), Celgene holds the same type of potentially overinclusive database as the defendants in *City Select*. Celgene Opp. at 33; *Nexium*, 777 F.3d at 19 (finding class with nearly identical definition ascertainable) (citing *Carrera v. Bayer Corp.,* 727 F.3d 300, 306 (3d Cir. 2013) *and Marcus v. BMW of North America, LLC,* 687 F.3d 583, 592–93 (3d Cir. 2012)).

Celgene possesses identifying information for every consumer who took Thalomid or Revlimid during the class period,[12] yet claims "[n]one of that matters here." Opp. at 17. But *City Select* (binding precedent which Celgene fails to cite) makes clear that this is exactly what matters here. In fact, if class member affidavits are sufficient to ascertain a class from an overinclusive database, then surely the pre-existing documentation that Plaintiffs proposed to use here (purchase receipts, pharmacy records, insurance claim records, and prescription drug coverage documentation from any insurers to check for flat co-pays), combined with Celgene's own database, would meet the *City Select* standard.[13] As shown by David Mitchell's documentation (cited by Celgene), these same data sources

---

[11] Unless otherwise noted, internal citations and quotations have been omitted.
[12] Celgene recently produced a subset of its REMS database to Plaintiffs. ███████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
[13] While unnecessary due to these other data sources, another option would be to obtain data from

reveal whether the patient paid a flat co-pay. Celgene Opp. at 19-20 (2016 enrollment brochure showed different co-pays for brands and generics). Although Celgene laments that proposed class representative David Mitchell had only one purchase receipt in his possession (*see* Celgene Opp. at 16-17), the potential that consumers may not have "documentation to support their claims of injury or damages does not mean a class of consumers cannot be certified." *Lidoderm,* 2017 WL 679367, *25 ("Post-judgment claims forms and other tools can be used to allow defendants to test a class member's purported entitlement to damages and to apportion damages appropriately").

As to third party payors, Plaintiffs have proposed a similar set of records to demonstrate class membership. Plaintiffs have substantial transaction data from pharmacies that dispensed Thalomid and Revlimid during the class period (accounting for about half of all prescriptions), in which third-party payor purchasers are identified.[14] In addition, third-party payors can submit their own transaction data as proof of purchases, in conjunction with documents showing they are not fully insured. Using these documents to confirm class membership conforms with the Third Circuit's requirements. "There will always be some level of inquiry required to verify that a person is a member of a class. . . . Such a process of identification does not require a 'mini-trial,' nor does it amount to 'individualized fact-finding,' and indeed must be done in most successful class actions." *Byrd*, 784 F.3d at 170-71 (quoting *Carrera*, 727 F.3d at 307); *see also In re Cmty. Bank of N. Va. Mortg. Lending Practices*, 795 F.3d 380, 396-97 (3d Cir. 2015) (when certain class member's claims would have transferred to bankruptcy estate, individual class members could be ascertained through combination of defendant database and individualized review of class member's bankruptcy records).

---

the five largest PBMs in the country, which account for some 90% of prescriptions issued nationwide. DeBree Decl. ¶ 24-37. *See* Ex. 117 (sample data from PBM Express Scripts showing payment amounts by TPP and consumer, and location of consumer and pharmacy). ███████

[14] *See* Plaintiffs' Mem. in Support of Class Certification (Pltf. Mem.), Ex. 93-94; *see also* Ex. 118 (data produced by ████ Specialty Pharmacy showing purchases mostly by TPP ████).

Celgene's claim that Plaintiffs are required to "net" payments in order to ascertain class members is wrong, and confuses ascertainability with predominance. *See Nepomuceno v. Midland Credit Mgmt., Inc.*, Case No. 14-05719, 2016 WL 3392299, at *3-4 (D.N.J. June 13, 2016) (defendant confused ascertainability and predominance in arguing that individualized determination of impact defeated ascertainability);[15] *Byrd*, 784 F.3d. at 165 ("If defendants intend to challenge ascertainability, they must be exacting in their analysis and not infuse the ascertainability inquiry with other class-certification requirements."); *see also* Section II.B.1. Patients, health benefit plans, and health insurers are members of the Damages Classes if they fit the class definition (paid some or all of the purchase price of Thalomid and Revlimid), and do not fall into one of the exclusions. Thus, Celgene's claim that Plaintiffs must "net" payments and account for rebates from PBMs or payments from stop-loss insurers to determine class membership is wrong.[16] The class does not exclude third-party payors that received rebates or other payments from their PBMs or stop-loss insurers; a plain reading of the class definitions shows that such payments have no bearing on class membership. And as discussed in Section I, *supra*, neither PBMs nor stop-loss insurers are themselves class members, and thus need not be identified to meet ascertainability requirements.

1. **Plaintiffs' Proposed Method for Ascertaining Whether a Payment Was Made in a Damages Class State**

Plaintiffs' method for ascertaining whether someone is a class member from a Damages

---

[15] In *Nepomuceno*, plaintiffs sought to certify a class of New Jersey residents to whom the defendant had sent a "Statement" containing a demand for interest and a due date. *Id.* at *3. The defendant argued that the class was not ascertainable, because "determining the original creditor, the nature of the debt obligation, and the interest rate charged as to each class member would require an account-by-account analysis, which renders class certification inappropriate." *Id.* The court held that this conflated ascertainability and predominance, and that "[t]he proposed class definition simply requires individuals to be New Jersey residents to whom Plaintiff sent a Statement containing a due date and/or an interest charge during a limited time period." *Id.* at *3-4.

[16] *See* Celgene Opp. at 14-15; █████████████████████████████

Class state is simple: did they purchase or pay for some or all of the purchase price of Thalomid or Revlimid in a Damages Classes state? For consumers, a purchase occurs during the transaction with the pharmacy, which for Thalomid or Revlimid typically takes place over the telephone. So if consumers were in a Damages Class state when they made the purchase, then (as long as they do not pay a flat co-pay for all prescriptions) they are members of the Damages Classes. *See In re Niaspan Antitrust Litig.,* 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014) (plaintiffs may sue under laws of states in which they reside or in which they purchased drug); *see also infra* Section II(C)(1). Their health plans would also be members of the Damages Class (as long as the plans are not fully-insured). *See Niaspan*, 42 F. Supp. 3d at 758.

Health plans can also be members of the Damages Classes if they themselves are located in one of the Damages Class states, as these health plans are paying for some or all (likely, most) of the purchase price of Thalomid or Revlimid from the state in which they are located. *See id.*; *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010) (finding plaintiff health and welfare plans had "standing to bring a claim under the laws of the states where they are located, and where they purchased Flonase or reimbursed their members for Flonase purchases"); *see also* Mem. Certify Class at 30 (collecting cases). These methods of ascertaining whether a payment was made in a Damages Class state are widely accepted (and indeed, appear undisputed by Celgene).[17]

## B.  PLAINTIFFS HAVE DEMONSTRATED THAT COMMON QUESTIONS PREDOMINATE IN SATISFACTION OF RULE 23(b)(3)

At its core, the predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and "assesses whether a class action 'would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons

---

[17] Whether a payment made *from* a non-Damages Class state *to* a pharmacy in a Damages Class state should count as a class purchase is not a question of ascertainability, nor does it need to be decided at this time, as it has no bearing on whether the class should be certified, and Celgene has conceded the adequacy of the class representatives for the states in the class definition.

similarly situated.'" *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011). Celgene does not

dispute that common questions predominate as to Celgene's liability, including its monopoly power,

exclusionary conduct in violation of state antitrust and consumer protection laws, the definition of

the relevant market, and its unjust enrichment. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997)

(predominance requirement of Rule 23(b) "is a test readily met in certain cases alleging consumer or

securities fraud or violations of the antitrust laws"); *In re Neurontin*, No. 02-1390, 2011 WL 286118,

at *6 (D.N.J. Jan. 25, 2011) ("Courts have routinely found that proof of [monopolization] focuses

on the defendant's conduct, not on the conduct of individual class members, and is therefore well

suited for class treatment.").

Instead, Celgene argues that the issue of injury-in-fact (impact) is an individualized question.

For the reasons explained herein, it is not, but even if it were, "it does not necessarily follow that

[those questions] *predominate* over common ones and that class action treatment is therefore

unwarranted." *Nexium*, 777 F.3d at 21.[18]

### 1. Celgene Has Failed to Rebut Plaintiffs' Showing that Substantially All Class Members Were Injured

Through Dr. Leitzinger's analysis, Plaintiffs have demonstrated that Celgene's conduct

impacted all or nearly all class members. Plaintiffs presented a two-step method to demonstrate

impact by showing that (1) Celgene's conduct effectively kept the price of thalidomide and

lenalidomide higher than it would have been in a competitive market, and (2) all or substantially all

class members paid these inflated prices. *See Castro v. Sanofi Pasteur*, 134 F. Supp. 3d. 820, 847 (D.N.J.

2015) (approving similar method); *Lidoderm*, 2017 WL 679367, * 16 (same). In fact, Celgene does not

dispute that Plaintiffs have demonstrated that generic equivalents to Thalomid and Revlimid would

_____

[18]

be less expensive than Celgene's branded Thalomid and Revlimid, or that most class members were likely injured. Instead, Celgene (through Dr. Hughes) presents hypothetical scenarios in which certain class members may have escaped injury. But, Celgene has not shown that these circumstances were likely, common, or that they would cause individualized issues to predominate.[19] *See Nexium*, 777 F.3d at 31 ("The defendants' speculation cannot defeat the plaintiffs' showing.") (citing *Messner*, 669 F.3d at 825 (once plaintiffs had shown broad antitrust impact, certification could not be denied just because defendants pointed to a class of uninjured members but "[gave] no indication how many such individuals actually exist")); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2017 WL 4621777, at *16 (Oct. 16, 2017) (defendants presented no evidence to demonstrate that number of uninjured class members was more than de minimis). As in *Nexium*:

> There is no serious dispute that the majority of class members were injured. It is undisputed that the price that would have been paid by class members for generic Nexium but-for defendants' conduct ("but-for price") is lower than the actual price paid by class members during the class period for branded Nexium ("class period price"). For those class members who were reimbursed for their purchases by an insurance plan and paid only a copayment, it is similarly undisputed that the generic copayment is almost always lower than the brand-name copayment. **The dispute here focuses on various purchasers who were atypical and allegedly uninjured.**

777 F.3d at 26 (emphasis added).[20]

---

[19] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[20] This case is unlike *Harnish v. Widener University School of Law*, in which plaintiffs were unable to prove that all market participants would have paid lower prices for tuition absent defendant's alleged fraudulent misrepresentations, under New Jersey and Delaware statutes that are not at issue in this case. 833 F.3d 298, 312 (3d Cir. 2016). Here, there is no dispute that generic Thalomid or Revlimid would cost less than brand. Nor is it like *Newton v. Merrill Lynch*, where plaintiffs alleged that *some* stock trades could have been executed at better prices by defendant brokers, such that the task of distinguishing which trades caused injury was an individualized, trade-by-trade inquiry. 259 F.3d 154, 178-81 (3d Cir. 2001) (the "listed price *may or may not* have provided a class member with the best

Celgene fundamentally misunderstands the law of class certification. The law does not require that class members sustain net damages to suffer injury, or that uninjured class members be identified by name at this stage using one document common to the class. *See Sanofi Pasteur*, 134 F. Supp. 3d at 847 ("Antitrust impact is shown where class members suffered . . . payment of an overcharge on at least one transaction."); *Nexium*, 777 F.3d at 24 ("Uninjured members of the putative class would be identified in the liability proceedings later in the case, as [*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2408, 2412 (2014)] contemplates").

### a.   Plaintiffs Already Accounted for the Existence of Potential Brand Loyalists

In his initial report, Dr. Leitzinger opined that substantially all class members were injured by Celgene, paying more for branded Thalomid or Revlimid than they would have for a generic equivalent. In reaching that conclusion, Dr. Leitzinger calculated the percentage of prescriptions of Thalomid or Revlimid that would be filled with a generic instead of a branded version, which he described as the "generic penetration rate." *See* Leitzinger Report ¶ 51 and Ex. 5. In other words, he acknowledged that some prescriptions might not convert – due in large part to brand loyalists.

He made these calculations based on 1) economics literature on the generic competition observed for an average small-molecule drug; 2) data on orally administered non-REMS cancer drugs and non-cancer REMS drugs that experienced generic entry; and 3) Thalomid and Revlimid-specific generic conversion forecasts prepared by Celgene and generic manufacturers. His generic penetration rate estimate employs common evidence, and provides a reliable estimate commonly used to calculate impact in end payor cases. *E.g., Nexium*, 297 F.R.D. at 183 (certifying end payor

---

price"). Here, Plaintiffs have shown that substantially all class members would have paid less for generic Thalomid and Revlimid at least once during the class period. Speculation that some outlier class members might escape loss does not preclude class certification where "there is no reason to think that these questions will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3). That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014).

class over Dr. Hughes's objection to the existence of uninjured brand loyalists); *Lidoderm*, 2017 WL 679367 (same). Based on this evidence, Dr. Leitzinger found that at least 90% of consumers were impacted by Celgene's conduct (and all or virtually all third-party payors were impacted), accounting for 99% of class period prescriptions. Leitzinger Report ¶¶ 36-37; Leitzinger Rebuttal ¶ 57.

Celgene has not argued that the Court should deny certification if 10% of consumers were brand loyalists (accounting for 1% of class-period payments for Thalomid and Revlimid). And courts universally allow certification despite the existence of uninjured class members. *See Nexium*, 777 F.3d at 30-31 (holding that pure brand loyalists would not cause individualized issues to predominate over the common issues); *Solodyn*, 2017 WL 4621777, at *7 (rejecting assertions that presence of brand loyalists destroys predominance); *Messner*, 669 F.3d at 823 ("a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable . . . . Such a possibility or indeed inevitability does not preclude class certification . . . .").[21]

Instead, Dr. Hughes expresses his concern that Dr. Leitzinger has not already identified these brand loyalists by name (or said how he planned to do this in the future).[22] But the predominance requirement of Rule 23(b) is not concerned with identifying individual class members. *Nexium*, 777 F.3d at 21 ("We do not think the need for individual determinations or inquiry for a de minimis number of uninjured members at later stages of the litigation defeats class certification."). The only reason to identify brand loyalists is so they can be allocated zero damages. But allocation of damages is not an issue for class certification. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.

---

[21] Because Dr. Leitzinger has demonstrated that substantially all class members were impacted by Celgene's conduct, and plaintiffs have identified a method to identify this small subset at the damages allocation phase, this case is unlike *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, plc.*, No. 04-5898, 2010 WL 3855552, at *28 (E.D. Pa. Sept. 30, 2010), where there were "a great number" of uninjured class members that could not be identified.

[22] ████████████████████████████████████████████

1977) ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate") (abrogated on other grounds).[23]

In *Lidoderm* and *Nexium*, Dr. Hughes made identical arguments at class certification, expressing his concern that the plaintiffs' expert had not identified brand loyalists by name or stated how he intended to do so in the future. Both courts rejected these arguments and certified the classes, recognizing that there was no need to identify brand loyalists until after trial.[24] During the damages allocation phase, both courts recognized that consumers could "establish [their] injury through testimony… that, given the choice, he or she would have purchased the generic." *Nexium*, 777 F.3d at 20; *Lidoderm*, 2017 WL 679367, *17; *Solodyn*, 2017 WL 4621777, *16 and n. 16 (same); *see also In re Relafen Antitrust Litigation*, 221 F.R.D. 260, 272 (D. Mass. 2004) ("Any uncertainty [around brand loyalists] accordingly concerns the amount rather than the fact of injury, and therefore should not preclude recovery, particularly where the uncertainty stems from delay that the end payor plaintiffs attribute to SmithKline's wrongful conduct."). The First Circuit noted that because "consumer testimony would be sufficient to establish injury in an individual suit, it follows that similar testimony in the form of an affidavit or declaration would be sufficient in a class action.

---

[23] *See also Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001) (affirming district court's determination that common issues predominated because "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue"); *Smilow v. S.W. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) (holding that the potential difficulty of damages calculations does not preclude class certification); *Blackie v. Barrack*, 524 F.2d 891, 905, 907-08 (9th Cir .1975) (same).

[24] *Nexium*, 777 F.3d at 19-20; *Lidoderm*, 2017 WL 679367, *17-19. In *Lidoderm* and *Nexium*, the courts noted that the plaintiffs' experts accounted for brand loyalists as up to 6.1% of consumers (in Lidoderm) and 5.8% of prescriptions (in Nexium) in the aggregate damages model and opined that substantially all class members were impacted, as Dr. Leitzinger has done here. ████████████████████████

████████████████████████████████████████████████████████████████

There cannot be a more stringent burden of proof in class actions than in individual actions." *Nexium*, 777 F.3d at 20.[25] The Court should take a similar approach here after there is a damages award to allocate among class members. *See City Select*, 867 F.3d at 441 (class members may need to submit affidavits to verify their membership in the class); *Id.* at 446-47 (Fuentes, J., concurring) (challenges to a particular class member's inclusion and individual damages incurred are more appropriately addressed at the damages stage after certification).[26]

Notwithstanding the binding *City Select* holding, Celgene relies on one unreported district court opinion agreeing with Dr. Hughes, concluding that if the plaintiffs did not have a "class-wide methodology for *identifying* [brand loyalists]," then individualized inquiries would "predominate." Celgene Opp. at 32 (citing *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1833, 2015 WL 3623005, at *19 (E.D. Pa. June 10, 2015)). But *Vista Healthplan* was decided before the Third Circuit clarified that Rule 23 does not require plaintiffs to have one database that definitively identifies potential class members. *City Select*, 867 F.3d at 441-42 (class members may need to submit affidavits to verify their membership in the class). Moreover, Plaintiffs have offered a class-wide methodology accounting for brand loyalists. Leitzinger Rebuttal at ¶¶ 56-57. Controlling precedent is clearly established by the Third Circuit's decisions in *Bogosian* and *City Select* (both of which Celgene failed to cite in its opposition)—not the district court's unreported decision in *Vista Healthplan*.

**b.  Plaintiffs Accounted for Patients Who Received Co-Pay Assistance**

Celgene contends that Plaintiffs failed to account for patients who are uninjured because they participated in Celgene's commercial co-pay program, through which it contributes up to ▮▮▮▮▮

---

[25] The First Circuit also proposed a "presumption that consumers would purchase the generic if it were available, i.e., a presumption that economically rational consumers faced with two identical products would purchase the less expensive alternative," similar to the presumption of reliance in securities class actions and would be subject to rebuttal by the defendant. *Nexium*, 777 F.3d at 20.
[26] If affidavits declaring intent to switch to a generic were deemed insufficient, consumers could submit a prescription drug purchase history to demonstrate they take generic drugs when available.

annually towards a participant's copayments. Dr. Leitzinger, however, excluded all such donations from his aggregate damages. ██████████████████████████████████

██████████████████████ ██████████████████████████████████

██████████████████████████████████████████████████

Given the parameters of Celgene's Co-Pay Assistance program, recipients are likely to be injured if any of the following is true: (1) their co-pay for generics was less than ████████████; *or* (2) their co-pay for generics was less than ████████████;[27] *or* (3) they received the maximum ████████ in co-pay assistance in a given year before their last prescription was filled; *or* (4) they otherwise did not qualify or apply for Celgene's Co-Pay Assistance program for any one prescription they received of Thalomid or Revlimid. Dr. Hughes speculated about the existence of a potential class member with a certain plan who was uninjured after receiving Celgene's co-pay assistance. Hughes Report at ¶ 57. ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████

Thus, Dr. Hughes has again offered mere conjecture to support his argument. *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("possibility" of uninjured class members does not preclude class certification). The Co-Pay Assistance Program at most allows a de minimis number of class members to escape injury, which Dr. Leitzinger already accounted for at ¶ 47 of his Report.[28]

---

[27] ████████████████████████████████████████████████████
████████████

[28] If, however, the Court were to conclude that the number of uninjured class members receiving Celgene's Co-Pay Assistance is *not* de minimis, it could exclude "consumers whose only purchases of

### c.   The Existence of Plan Maximums Does Not Defeat Class Certification

Based on Dr. Hughes's speculation, Celgene hypothesized that a class member could have a contractual cap on what it must pay for prescription drugs, and that these class members may have reached those plan maximums paying for a generic Thalomid or Revlimid (thus, it concludes, escaping injury). But plan maximums do not defeat class certification because Celgene has failed to demonstrate that these plan arrangements were common, or that they resulted in *any* class members actually escaping injury. *See Nexium*, 777 F.3d at 27 ("defendants incorrectly assume that class members are shielded from injury by plan arrangements that the district court found did not exist.").

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ ████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

If a consumer[30] or a third-party payor[31] paid more for brand Thalomid or Revlimid than it would have for generic Thalomid or Revlimid *one time,* then it was injured. *See Sanofi Pasteur*, 134 F.

Thalomid or Revlimid were through Celgene's Co-Pay Assistance Program." ██████████████
[29] ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████

[30] Dr. Hughes states that ████ of consumers hit their plan maximums within a given year. Hughes ¶ 54. But as Dr. Leitzinger makes clear, many of these consumers suffered antitrust injury caused by Celgene *before* reaching those plan maximums. Leitzinger Rebuttal ¶ 41. And consumers who always hit their maximums *before* paying for Thalomid or Revlimid are not class members.

[31] ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Supp. 3d. at 847. It is irrelevant to antitrust injury if that class member subsequently limited the damage it suffered from Celgene's overcharge with contractual maximums (or in a world with generics, if it would have reached those maximums eventually). Nor, in those circumstances, do plan maximums impact the aggregate damages estimate. When a consumer reaches a plan maximum but continues to take Thalomid or Revlimid, the third-party payor (also a class member) pays Celgene's overcharge. *See Solodyn*, 2017 WL 4621777, *16 ("even if the consumer would be uninjured [due to a plan maximum], the third-party insurer who actually paid the costs would have been overcharged, and the aggregate damages award would remain the same"). These concerns are only relevant to allocation of damage among class members, which is not an issue at class certification. *See supra* p. 14. And as Dr. Leitzinger opined, it is unlikely that a consumer would have hit an annual out-of-pocket cap on a first purchase of Thalomid or Revlimid. Leitzinger Rebuttal ¶¶ 41-42.

Dr. Hughes posits that class members with cancer might reach their plan maximums before paying for Thalomid or Revlimid. ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ But that is not how the class definition works. If a consumer never paid for Thalomid or Revlimid, then the consumer is not a class member. If Dr. Leitzinger included those transactions for the purpose of his aggregate damages estimate, it is because the third-party payor (not the consumer) paid some or all of the purchase price. Leitzinger Rebuttal ¶¶ 37-38.

### d. The Other Unproven Hypotheticals Dr. Hughes Invented Do Not Defeat Class Certification

In another creative hypothetical, Dr. Hughes opined that some consumer class members may have escaped impact if their health plan had placed generic Thalomid or Revlimid on the same specialty tier as branded Thalomid or Revlimid, and that tier required a flat dollar co-pay (e.g., $25/prescription), such that the consumer would have paid the same co-pay regardless of whether they purchased a generic or brand. ██████████████████████████████████████████



In fact, health plans benefit when consumers take generic drugs, so they create incentives to encourage consumer members to choose generics by placing them on less expensive tiers than brands. *See, e.g.,* Ex. 121

Ex. 122 (Highmark places generic Xeloda, Gleevec, and Temodar on a lower cost tier for consumers than their branded equivalents); Ex. 123 (same for SavRx, the PBM for named plaintiff IUB). In short, it is pure speculation that some third-party payor might place generic Thalomid and Revlimid on the same tier as the brand (and would still result in injury to the third-party payor class member).[32] *See* Leitzinger Rebuttal ¶ 39. Such unfounded hypotheticals cannot defeat class certification. *Nexium*, 777 F.3d at 31.

### e. Stop-Loss Insurance and PBM Rebates Are Irrelevant Because Impact Occurs When Class Members Overpaid for Thalomid and Revlimid

Celgene speculates that some third-party payor class members may have contracted for stop-loss insurance to prevent catastrophic claims from upsetting their financial reserves.[33] It also

---

[32] If a particular formulary required a consumer to pay a percentage of every drug's (generic and brand) purchase price (as coinsurance) and capped the consumer's out-of-pocket expenditure at a certain dollar amount, and that dollar amount was the same cap for both generic and brand (a circumstance not shown to exist in reality, and which is unlikely given the third-party payor's incentive to drive consumers to generics), then plaintiffs would consider that a flat co-pay, and the consumer would be excluded from the classes under the current definition.

[33]

speculates that class members may have received rebates from PBMs (not for Thalomid or Revlimid specifically, but for branded drugs generally), meaning that by netting all these payments, branded Thalomid or Revlimid might have cost less than a generic. *But see Nexium*, 777 F.3d at 28 (rejecting defendants' argument that some class members were not injured because they "benefited from rebates that reduced the actual class period price for branded Nexium"); *see also* Leitzinger Rebuttal ¶¶ 48-49. But such conjecture is irrelevant to impact, which occurs the moment the purchaser incurs an overcharge. "Antitrust impact is shown where class members suffered . . . payment of an overcharge on at least one transaction." *See Sanofi Pasteur*, 134 F. Supp. 3d. at 847; *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 151 (3d Cir. 2002).

Any later receipts are irrelevant to the question of impact. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 254 n.14 (1972) ("[C]ourts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped its loss . . . ."); *Nexium*, 777 F.3d at 27 ("defendants incorrectly assume that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury. But antitrust injury occurs the moment the purchaser incurs an overcharge whether or not that injury is later offset."). As a result, third-party payor class members were impacted the first time they paid for Thalomid or Revlimid. That impact (and class membership) is not eliminated if they later received a rebate, or payment from a stop-loss insurer. As Dr. Leitzinger opined, the chances of any third-party payor escaping *impact* is "diminishingly small." Leitzinger Report ¶ 37.

### 2. The Proposed Damages Methodology Results in a Reliable Class-Wide Estimate

Through Dr. Leitzinger, Plaintiffs have demonstrated that damages can be calculated on a

---

███████████████████████████████████
███████████████████████████████████ *See also* Leitzinger
Rebuttal ¶¶ 53-54 (stop-loss claims do not eliminate impact to class members).

class-wide basis. The Court should reject Celgene's assertion that Plaintiffs must calculate damages individual-by-individual. *See In re Processed Egg Products*, 312 F.R.D. 171, 202 (E.D. Pa. 2015) ("[a]t the class certification stage, the plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis."); *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 262 (3d Cir. 2016), *as amended* (Sept. 29, 2016) (predominance requirement met where Dr. Leitzinger created an aggregate "damages model that calculated the savings to the class if generic entry had occurred earlier"); *Byrd*, 784 F.3d at 176 (Rendell, J., concurring) ("courts determine the extent of a defendant's monetary liability to the entire class" in the aggregate); *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) ("[I]t does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.").

Dr. Leitzinger estimated the difference between what the Antitrust/Consumer Protection Damages Class actually paid for Thalomid and Revlimid, and what it would have paid in the but-for world if generic versions had been available (using entry dates provided by Mr. Molina). Leitzinger Report ¶ 55. For the Unjust Enrichment Damages Class, he estimated the difference between profits that Celgene actually earned and profits Celgene would have earned had it not blocked generic entry. Leitzinger Report ¶ 58. As such, his estimates do not suffer from the problem identified in *In re Pharmacy Benefit Managers Antitrust Litig.*, in which the damages model may have measured differences caused by legitimate market factors. No. 06-1782, 2017 WL 275398, at *31 (E.D. Pa. Jan. 18, 2017). These aggregate class-wide estimates are the standard methodology to calculate damages incurred by an end-payor class. *See, e.g., In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 233 (E.D. Pa. 2012); *Nexium*, 297 F.R.D. at 182; *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 326, 348 (E.D. Mich. 2001); *Solodyn*, 2017 WL 4621777, at *18-19.

Even if damages were individually calculated, it would not defeat class certification. *See Neale*

21

*v. Volvo Cars*, 794 F.3d 353, 374-75 (3d Cir. 2015) ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."); *Bogosian*, 561 F.2d at 456 ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate"); *Processed Egg*, 312 F.R.D. at 203 ("Circuit courts have largely rejected the interpretation urged by Defendants—that variations in damages calculations between and among class members defeat predominance.").[34] The Third Circuit has explicitly held that "it is 'a misreading of *Comcast*' to interpret it as 'preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement.'"). *Neale*, 794 F.3d at 375 (quoting *In re Deepwater Horizon*, 739 F.3d at 815 & n. 104, (5th Cir. 2014)); *see* Celgene Opp. at 37 (making this argument and citing *Comcast*).

Furthermore, there is no evidence that Dr. Leitzinger's aggregate estimates are inflated due to his use of IMS data (which classifies prescriptions based on the state of the prescriber) to estimate damages in Damages Class states. ██████████████████████ ████████████████████████████████████ ██████████████████████████ And as Dr. Leitzinger explains, the pharmacy data produced in this case (accounting for half of all prescriptions within the class) shows prescriptions used in the Class states during the damages period is within two-tenths of a percent of the volume prescribed in those states. Leitzinger Rebuttal ¶ 24. Dr. Leitzinger also performed several robustness checks on his state estimates by reviewing CDC data on diagnoses by state for myeloma and Non-Hodgkin Lymphoma (which are treated with Thalomid and Revlimid), and using

---

[34] *Grandalski v. Quest Diagnostics*, 767 F.3d 175, 185 (3d Cir. 2014) is inapposite. The motion to certify the class in *Grandalski* was denied not because of an individualized damages inquiry, but because the question of the defendant's *liability* was an individualized inquiry for each class member. Here, Celgene's liability is a common question, and will be answered identically for every class member.

census data based on age of population (as these diseases are more common in older patients), and found his state-by-state damage estimates were robust. Leitzinger Rebuttal ¶¶ 26-28. Moreover, Celgene's own REMS database, ███████████████████████████████████████████ ████████████████████████████████████████████ further corroborates Dr. Leitzinger's estimates ███████████████████████████████. *Id.* at ¶ 28.

If Celgene had paid rebates on Thalomid or Revlimid, Dr. Leitzinger would have made downward adjustments to the real-world average prices he calculated, decreasing his aggregate damages estimates. Leitzinger Report ¶ 48; *Solodyn*, 2017 WL 4621777, *18. ███████████ ███████████████████████ ██████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████

███████[35] In addition, contractual rebate guarantees should not offset the damages in this case because they would have been paid on a portfolio of drugs, not on Thalomid and Revlimid. DeBree Decl. ¶ 48; Leitzinger Rebuttal ¶¶ 30-31.

Moreover, Dr. Leitzinger discusses at length the robust and reliable way that he accounted for Medicare payments in his rebuttal report. ¶¶ 7-19. ███████████████████████████ ███████████████████████████████████████████████ ███████████████████████.[36] Last, payments that class members received under stop-loss insurance should not offset any damages because those payments were due under policies

---

[35] ███████████████████████████████████████████████
███████████████████████████████████████████
[36] ███████████████████████████████████████████████
███████████

guaranteeing reimbursement of expenditures over a certain amount – not tied to particular drugs. Leitzinger Rebuttal ¶¶ 54-55. Just as an insured person whose car was damaged in an accident is entitled to compensatory damages in a lawsuit against the wrongdoer (even if the insurer already paid the claim), third-party payors with stop-loss insurance are entitled to damages from Celgene. *See* Restatement (Second) of Torts, § 920A(2) ("Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable").[37]

In any event, it would be for the jury to decide whether Dr. Leitzinger's damages estimates were inflated. Such a determination would apply class-wide because the damages are estimated class-wide; therefore, any inflation would be a common issue that does not defeat certification. Plaintiffs have met their burden to demonstrate that "there is a reliable means for measuring damages with reasonable accuracy in the aggregate." *See Processed Egg*, 312 F.R.D. at 202-03; *see also Sanofi Pasteur*, 134 F. Supp. 3d at 849 (approving Dr. Leitzinger's aggregate class-wide damages model).

### 3. Common Proof of Plaintiffs' State Law Claims Predominates

Celgene places substantial weight on alleged "variations" among Plaintiffs' unjust enrichment and consumer protection claims. However, Celgene greatly exaggerates the supposed differences by (1) misconstruing the applicable state laws to manufacture variation where none exists, and (2) emphasizing variation that is simply not material. The proper scope of this inquiry is not whether

---

[37] Each of the states in the Damages Class would apply the so-called collateral source rule. *See, e.g., Lund v. San Joaquin Valley R.R.*, 31 Cal. 4th 1, 7, 1 Cal. Rptr. 3d 412, 416, 71 P.3d 770, 774 (2003); *Bushong v. Park*, 837 A.2d 49, 57 (D.C. App. 2003); *Robert E. Owen & Assocs. v. Gyongyoski*, 433 So. 2d 1023, 1025 (Fla. Dist. Ct. App. 1983), *petition for review denied* 444 So. 2d 417 (Fla. 1984); *Hayes Sight & Sound, Inc. v. ONEOK, Inc.*, 281 Kan. 1287, 136 P.3d 428, 440 (2006); *Law v. Griffith*, 457 Mass. 349, 355, 359, 362, 930 N.E.2d 126, 132, 134-35, 137 (2010); *Hoitt v. Hall*, 661 A.2d 669, 674 (Me. 1995); *Tebo v. Havlik*, 418 Mich. 350, 343 N.W.2d 181, 196, 198, 202 (1984); *Fickle v. State*, 274 Neb. 267, 269, 759 N.W.2d 113, 116 (2007); *Anastasia v. Barnes*, 127 Misc. 2d 971, 487 N.Y.S.2d 628, 630 (1985); *White v. Lowery*, 352 S.E.2d 866, 868 (N.C. Ct. App. 1987); *Colvin v. Goldenberg*, 273 A.2d 663, 666 (R.I. 1971); *White v. Jubitz Corp.*, 347 Or. 212, 236, 219 P.3d 566, 579 (2009); *Titchnel v. United States*, 681 F.2d 165 (3d Cir. 1982); *Fye v. Kennedy*, 991 S.W.2d 754, 763-64 (Tenn. Ct. App. 1998).

there are *any* differences, but whether there are material differences such that the evidence of the state law violations are not susceptible to common proof. Plaintiffs' state law claims readily satisfy the predominance standard, as conceded in part by Celgene regarding Plaintiffs' antitrust claims. Moreover, to the extent the Court finds any of the alleged variations relevant, those differences are easily managed by grouping discrete conflicts together.[38] Accordingly, a centralized class action would preserve judicial resources better than myriad state class actions, much less individual actions.

### a.   There are No Material Variations Among the Unjust Enrichment State Laws

"Although [defendants] insist that unjust enrichment's elements vary from state to state, all states' unjust-enrichment laws are nearly identical."[39] Celgene attempts to construct six "significant variations," but its argument is easily undercut by the ample authority provided by Plaintiffs in Appendix E. (Pltf. Mem.) For example, in support of its argument that there is a "significant" variation regarding whether the applicable jurisdictions recognize unjust enrichment as an independent cause of action, Celgene cites inferior case law that is directly contradicted by binding precedent previously cited by Plaintiffs. *See* Celgene Appendix A; Plaintiffs' Appendix E; *compare, e.g., Lopes v. Commonwealth*, 811 N.E.2d. 501, 509 (Mass. 2004) (Celgene) *with Metro. Life Ins. Co. v. Cotter*, 984 N.E.2d 835, 850 (Mass. 2013) (Plaintiffs); *State of Fla., Office of Atty. Gen., Dept. of Legal Affairs v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1309 (S.D. Fla. 2005) (Celgene) *with Fla. Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1241 n.4 (Fla. 2004) (Plaintiffs); *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (Celgene) *with Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 353

---

[38] In addition, should the Court determine that any of the alleged variations are unmanageable, subclasses could be created, or the Court could simply exclude the pertinent state law claim. Alterations to the class definitions can also be made at a later date if the need becomes apparent. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

[39] Daniel R. Karon, *Undoing The Otherwise Perfect Crime – Applying Unjust Enrichment to Consumer Price-Fixing Claims*, 108 W. Va. L. Rev. 395, 409 (Winter 2005); *see also id.* at 418 n.79 (national state law survey showing "all states' unjust-enrichment laws contain virtually identical elements").

P.3d 319, 326 (Cal. 2015) (Plaintiffs). Thus, Celgene has simply located lone opinions that misapply

state law or no longer reflect current law. Plaintiffs, on the other hand, have cited controlling

precedent on this non-existent "variation" from the highest state courts in the very jurisdictions

where Celgene purports to have identified inconsistencies.

      Celgene next suggests that the conduct required to prove unjust enrichment varies

throughout the relevant jurisdictions. This suggestion is also irrelevant to the predominance analysis,

as the alleged variations merely reflect the facts of the cases cited, but the key element is shared:

there must be wrongful conduct. *See, e.g., Gutteridge v. J3 Energy Grp., Inc.*, No. 3397 EDA 2013, 2017

WL 2402832, at *6 (Pa. Super. Ct. May 17, 2017) ("To sustain a claim of unjust enrichment, a

claimant must show that the party against whom recovery is sought either wrongfully secured or

passively received a benefit that it would be unconscionable for her to retain . . . the most critical

element of this equitable doctrine [ ] is whether the enrichment of the defendant is unjust."). "Unjust

enrichment is an equitable remedy, and thus by its very nature is a flexible doctrine." *In re TFT-LCD*

*(Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 4501223, at *7 (N.D. Cal. Sept. 28, 2011)

("As a cause of action based in equity, 'the requirements of proof of unjust enrichment are neither

technical nor complicated.'") (citing Restatement (Third), Restitution, § 1, cmt. a (noting the

"inherent flexibility of the concept of unjust enrichment")). Underscoring the specific conduct that

courts have held qualify as unjust or wrong, such as fraud or solicitation, does not change the heart

of an unjust enrichment claim, particularly where, as here, Plaintiffs have identified a multitude of

bad acts committed by Celgene that would qualify as unjust under each state's law.[40]

---

[40] Celgene's "direct benefit" cases are also inconsequential when examined closely. *See, e.g., Taghadoss v. Bank of Am., N.A.*, No. 17-1894, 2017 WL 6536581, at *2 (M.D. Fla. Dec. 21, 2017) ("a plaintiff need not be in direct contact with a defendant to confer a direct benefit on it"); *Melton v. Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1307 (S.D. Fla. 2017) ("Century next argues that there is no *direct* benefit under Florida law because no named Plaintiff purchased a rifle directly from Century. But Century's argument is contrary to Florida law, which provides that no direct contact is

Celgene identifies another false conflict in suggesting unjust enrichment claims may not always apply in the indirect purchaser context. Celgene cites *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007), a case that states a "plaintiff need not be in privity with the defendant to state a claim for unjust enrichment," for the proposition that the law requires a relationship that is not "too attenuated." But this "variation" is immaterial, as courts regularly apply New York unjust enrichment law in the indirect purchaser context,[41] with one recent decision explicitly rejecting Celgene's interpretation of *Sperry*. *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729, n.25 (S.D.N.Y. 2017) ("While defendants cite [*Sperry*] for the proposition that 'End–Payors cannot use unjust enrichment as a substitute for antitrust claims,' the holding of this decision is much narrower and ruled only that it was not appropriate for End–Payors to substitute unjust enrichment to avoid statutory limitations on treble damages.").[42]

Celgene's remaining arguments all suffer similar defects; the variations are non-existent, minor, or immaterial. Should the Court deem any variations significant, all the identified categories can be easily divided into sub-groups. For example, the alleged "variation" regarding no adequate remedy at law falls into two categories—whether the claim is precluded if Plaintiffs have a separate adequate remedy at law, or whether it is not. Similarly, regarding Celgene's statute of limitations argument, this case was filed in 2014, and the class period begins in 2010. Thus, assuming the earliest possible date of accrual of Plaintiffs' claims, Celgene only has potential statute of limitations argument for statutes that are less than four years. Celgene's Appendix A has conveniently identified

---

required for a direct benefit to be conferred."); *see also* Plaintiffs' Appendix E.

[41] *See, e.g., In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004); *TFT-LCD*, 2011 WL 4501223, at *10; *Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 149 (N.Y. App. Div. 2004); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000).

[42] Celgene also cites *Sheet Metal Workers Local 441 Health and Welfare Plan v. GlaxoSmithKline PLC*, 263 F.R.D. 205 (E.D. Pa. 2009) to highlight alleged distinctions between New York law as compared to Illinois and Alabama law, but there are no Illinois or Alabama claims at issue here, so this argument fails on its face without even reaching the alleged variations.

those statutes and broken them into two groups: California has a two-year statute of limitations, while DC, Kansas, North Carolina, Massachusetts, and Michigan each have three-year statute of limitations. Such minor variations can be easily accounted for and are subject to common proof. *See, e.g., Nexium*, 297 F.R.D. at 175–76 ("the variance in state laws and statutes of limitations do not bar class certification under Rule 23(b)(3)"); *Lidoderm*, 2017 WL 679367, at \*27; *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 297 (1st Cir. 2000). Celgene's smoke and mirrors attempt at engineering material variations where none exist fails.

### b. There Are No Material Variations in the Consumer Protection State Laws

Celgene concedes that common issues predominate as to Plaintiffs' monopolization and attempted monopolization claims within the Antitrust/Consumer Protection Damages Class. *See* Cons. Am. Compl. at Claims I and II. It is therefore undisputed that any questions regarding the elements of the state antitrust claims brought pursuant to *Illinois Brick* "repealer" statutes are common to the class.[43] This includes Plaintiffs' "consumer protection" claims under the laws of California, Florida, and Massachusetts, as Plaintiffs have *only* pleaded claims under the *Illinois Brick* repealer statutes in those states. *See* Cons. Am. Compl. at Claim III (consumer protection statutes identified are duplicative of the statutes listed under Claims I and II). In addition, Plaintiffs have not asserted consumer protection claims under Kansas or Tennessee law. Thus, the only open question regarding the Antitrust/Consumer Damages Class is whether Plaintiffs' consumer protection claims under the laws of the District of Columbia, Maine, Michigan, Nebraska, New York, North Carolina,

---

[43] In addition to failing to argue that there is substantial variation among Plaintiffs' antitrust claims, Celgene also affirmatively relies on an argument by the *Lidoderm Plaintiffs* to underscore the uniformity of state indirect purchaser antitrust claims, explaining they "are interpreted consistently with federal antitrust law (and therefore will rise and fall with the [plaintiffs'] Sherman Act claims) and any differences are not really material because the core elements of the state laws in play are identical." *Lidoderm*, 2017 WL 679367, at \*27; Celgene Opp. at 43 n.18. Celgene suggests that this quote distinguishes state antitrust claims as more manageable than unjust enrichment and consumer protection claims, but that suggestion is belied by the actual opinion, as the *Lidoderm* court did not address any other state law claims.

Oregon, Pennsylvania, and Rhode Island are similarly subject to common proof. As explained above

regarding Plaintiffs' unjust enrichment claims, despite Celgene's superficial use of the case law,

common issues predominate.[44] Moreover, half the purported variations identified in Celgene's

Appendix B: (1) relate exclusively to damages, despite the fact that individual damages calculations

cannot defeat predominance, *see, e.g., Neale*, 794 F.3d at 374-75; or (2) focus on statutes of

limitations, a minor variation that is remedied easily in this case, *see* Section II(B)(3)(a), *supra*. In sum,

to the extent there are minor variations among the applicable state laws, they do not predominate

over the core elements of Plaintiffs' claims: whether Celgene engaged in anticompetitive conduct;

whether that conduct resulted in artificially inflated prices for Thalomid and Revlimid; and the

aggregate damages suffered by the Classes.[45]

---

[44] *See* Plaintiffs' Appendix E; *see also, e.g., In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 702 (E.D. Pa. 2014) (finding end payors successfully stated a claim under NY's consumer protection law where the defendant "fabricated safety issues with Suboxone tablets and targeted consumers, among others, in an effort to maintain a monopoly for Suboxone," and end payors "either directly purchased or reimbursed their members—i.e. consumers—for the product"); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 228 (S.D.N.Y. 2012) ("because Defendants' conduct was plausibly 'imbued with a degree of subterfuge,' and the fraud was plausibly designed to prevent competitors' entry into the market, thereby allowing Defendants to overcharge consumers for DDAVP, Plaintiffs have stated a claim under [New York] Section 349"); *State ex rel. Redden v. Disc. Fabrics, Inc.*, 289 Or. 375, 385, (1980) ("the term 'wilful,' as defined by ORS 646.605(9), requires no more than proof of ordinary negligence by a defendant in not knowing, when it should have known, that a representation made by him was not true"); *Simler v. Conner*, 372 U.S. 221, 222 (1963) ("the right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions").
[45] In addition, in states where Plaintiffs have pleaded antitrust and consumer protection claims, the consumer protection claims may not need to be litigated. Plaintiffs have brought monopolization and attempted monopolization claims in every damages state except Pennsylvania, where the allegations pleaded here would easily establish a consumer protection violation. *See Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 421 (E.D. Pa. 2010) (finding indirect purchasers' allegations of sham patent infringement lawsuits sufficient to state a claim under "broad scope" of PA consumer protection statute); *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 547 (E.D. Pa. 2012) ("A plaintiff need not be in direct privity with a defendant to bring an action under the UTPCPL for the defendant's wrongful conduct."). Plaintiffs' expert has put forth a single damages model for the Antitrust/Consumer Protection Damages class. *See* Leitzinger Report at § V, Exs. 7A-B.

At trial, any material variations in consumer protection laws can be handled via a special verdict form or by separating the purported differences into groups, as with the unjust enrichment claims. *See Lidoderm*, 2017 WL 679367, at *27 (noting state law "differences can be readily accommodated on a special verdict form or through other mechanisms routinely employed in complex litigations like this one"). These simple procedural solutions are far more efficient than individual or even state-wide class lawsuits. *See generally George v. Nat'l Water Main Cleaning Co.*, 286 F.R.D. 168, 183 (D. Mass. 2012) (granting class certification because "for reasons of consistency and economy—both for the litigants and the courts—these issues should be decided once in a uniform manner on a class basis rather than being repeatedly litigated through individual lawsuits.").

## C.      DAVID MITCHELL HAS STANDING TO BRING HIS CLAIMS

Of the six Plaintiffs that are proposed as representatives of the class, Celgene challenges the adequacy and typicality only of David Mitchell, an individual patient who suffers from multiple myeloma and who was treated with – and paid for – Revlimid during the class period. Faced with the powerful testimony that Mr. Mitchell would provide at trial, Celgene seeks to disqualify Mr. Mitchell as a class representative on standing grounds. Celgene does not dispute that Mr. Mitchell has constitutional standing to bring these claims, it only argues that he does not have standing to bring an injunction claim under the Clayton Act or a damages claim under District of Columbia law.

### 1.   Mr. Mitchell Has Standing to Pursue Claims Under District of Columbia Law

Plaintiffs and Celgene agree that Mr. Mitchell has standing to bring a claim under the laws of his state of residence and the state in which he purchased Revlimid. *See* Celgene Opp. at 46-47 ("Mr. Mitchell sustained his alleged injury [in] the state where he allegedly paid too much for Revlimid") (citing, *inter alia, Flonase*, 692 F. Supp. 2d at 534 (holding that Plaintiffs have "standing to pursue claims in states where they reside, and where they purchased Flonase or reimbursed for purchases of Flonase"). In fact, in each of the cases Celgene cites to deny Mr. Mitchell's claim under District of

30

Columbia law, plaintiffs were found to have standing to assert claims in each state in which they alleged having made a purchase.[46]

Here, every part of Mr. Mitchell's purchase of Revlimid took place in the District of Columbia, even though he lived in Maryland while taking Revlimid. Mr. Mitchell (i) ordered Revlimid over the phone while in the District of Columbia; (ii) received mandatory counseling for consuming Revlimid while in the District of Columbia; (iii) answered mandatory REMS survey questions in the District of Columbia; (iv) provided his payment information while in the District of Columbia; and (v) received shipments of and signed for Revlimid in the District of Columbia.[47] He made these purchases on his credit and debit cards while in the District of Columbia. Although his credit card company mailed statements to his home in Maryland, his debit card was linked to a Flexible Spending Account offered by his employer in the District of Columbia.[48] These facts establish standing for Mr. Mitchell to bring a claim under District of Columbia law.[49]

---

[46] *See In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at *10 (D.N.J. Oct. 20, 2011) (state claims dismissed for states in which plaintiffs did not allege that they purchased the product at issue); *In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 926-27 (N.D. Cal. 2015) (same); *Suboxone*, 64 F. Supp. 3d at 692-94 (state claims dismissed for states in which plaintiffs did not allege that they resided, purchased reimbursed customers for the product at issue); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1163-64 (N.D. Cal. 2009) (plaintiffs conceded they lacked standing for claims under certain states' laws, which were then dismissed with leave to amend).
[47] Ex. 124, Mitchell Decl. ¶¶ 3-8; Ex. 125, Mitchell Dep. at 51:13-14, 52:18-20.
[48] Mitchell Decl. ¶ 5.
[49] Article III standing is not pegged to the location where Mr. Mitchell pays his credit card bill, but the location where he "purchases" the product. *See Capacitors*, 154 F. Supp. 3d at 927-28 ("a named plaintiff must have purchased the price-fixed product in the state under whose law he or she seeks to bring a claim"). Here, regardless of where he paid his credit card bills, Mr. Mitchell "purchased" his supply of Revlimid in D.C. by using his credit and debit cards to order Revlimid over the phone from D.C. and then receiving his Revlimid in D.C. *See, e.g., Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.*, 817 F.3d 241, 248 (5th Cir. 2016) ("'Purchase' means '[t]he acquisition of an interest in real or personal property by sale....' And a 'sale' may occur based on either an actual payment or a mere promise to make payment.'") (quoting Black's Law Dictionary (10th ed. 2014); *see, also Bourgeois v. Live Nation Entm't, Inc.*, 3 F. Supp. 3d 423, 448 (D. Md. 2014), *as corrected* (Mar. 20, 2014) ("location" of online concert ticket sales "may depend, inter alia, on the mechanics of the purchase process on the Ticketmaster website … the location from which the purchaser accessed the Ticketmaster website; the location at which the purchaser's electronic funds were received; the

In fact, Celgene seems to concede that if Mr. Mitchell had purchased Revlimid at a retail pharmacy in D.C., it would qualify as a D.C. purchase, but argues that a purchase made over the phone in D.C. does not qualify. Celgene Opp. at 47. Such parsing ignores modern day purchasing realities where credit card transactions are often made over the phone or internet. Mr. Mitchell has provided evidence sufficient to support his claim under District of Columbia law.

### 2.   Mr. Mitchell Has Standing to Seek an Injunction

Contrary to Celgene's assertion, without an injunction, Mr. Mitchell will likely suffer future injury, paying more for Revlimid than he would if a generic Revlimid were available.[50] Mr. Mitchell has multiple myeloma, an incurable blood cancer that he will battle for the rest of his life. As described in his prescribing doctor's declaration, there are numerous scenarios in which Mr. Mitchell will take Revlimid again in the future.[51]

Whether or not to take Revlimid is not a "choice" for Mr. Mitchell,[52] as it was for the plaintiffs in *McNair v. Synapse Group Inc.*, who Celgene notes were denied standing to represent an injunction-only class because they had not shown that they were likely to choose to subscribe to another magazine. 672 F.3d 213 (3d Cir. 2012). Nor is this case like *Smith v. Chrysler Fin. Co.*, in which the plaintiffs were denied injunctive relief based on their speculation that if they bought another car from defendants in the future, they might be offered racially discriminatory credit terms. No. 00-6003, 2004 WL 3201002, at *4 (D.N.J. Dec. 30, 2004). Here, there is no question that if Mr. Mitchell purchases Revlimid anytime in the next six years, he will pay more for it than he would have

---

[50] location from which Ticketmaster and/or the [theater] sent the tickets to the purchaser; the location at which the purchaser received the tickets; and, perhaps, the location of the event for which the ticket grants entry.").

[50] Celgene has not contested that the other named plaintiffs have standing to seek an injunction.

[51] Ex. 126, Decl. of ███████████, MD, ¶ 4.

[52] █████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

if Celgene had not blocked generic entry. And unlike the plaintiffs in *In re New Jersey Title Ins. Litig.*, 683 F.3d 452 (3d Cir. 2012), who did not assert that they would purchase title insurance in the future, Mr. Mitchell asserts (with evidence) that he will likely take Revlimid in the future, and will be injured again by paying Celgene's supracompetitive prices.

## D. THE PROPOSED INJUNCTION CLASS IS NOT SEEKING MONETARY RELIEF AND SHOULD BE CERTIFIED UNDER RULE 23(b)(2)

Plaintiffs have satisfied the requirements of Rule 23(b)(2).[53] Celgene challenges certification on the sole ground that "the relief sought is primarily monetary," but that argument does not apply to a large portion of the proposed Injunction Class. Members of the Damages Classes are indeed seeking monetary relief, but are limited to members in *thirteen states and the District of Columbia*, while the Injunction Class includes every person and entity *nationwide* with a claim under Section 16 of the Clayton Act. *See Mid-West Paper Prod. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 592 (3d Cir. 1979) (finding *Illinois Brick* indirect purchaser rule precluding suit for money damages does not apply to claims brought under Section 16 of the Clayton Act). Thus, just as claims for injunctive relief under the Clayton Act "do not undermine *Illinois Brick*, but rather fall properly outside its scope," the Injunction Class seeks an equitable remedy distinct from the monetary relief sought by the Damages Classes. *Relafen*, 221 F.R.D. at 273; *Mid-West Paper*, 596 F.2d at 592 ("enforcement of [] antitrust laws is augmented by allowing any individual threatened by the anticompetitive activity to challenge it.").

In fact, courts in the Third Circuit have rejected Defendants' position in the indirect purchaser context. *See, e.g., In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425, at *18 (E.D. Pa. Aug. 3, 2007) (certifying two classes, a Rule 23(b)(3) end payor class with indirect purchasers from eight states and a Rule 23(b)(2) nationwide class).[54] The defendants in *In re OSB Antitrust Litigation*

---

[53] ██████████████████████████████████████████████████████████████████████

[54] Celgene relies on *In re Processed Egg Prods. Antitrust Litig.*, 321 F.R.D. 555 (E.D. Pa. 2017). However, that case's procedural history reveals that the court considered the defendants' monetary relief

made the identical argument advanced by Celgene here. Plaintiffs responded in kind that "the claims for damages and injunctive relief are entirely separate—they arise under different statutes (Clayton Act versus state statutes) and are brought on behalf of different classes." 2007 WL 2253425, at *18. In summarily rejecting the defendants' argument, the court explained, "Although the classes are represented by the same named Plaintiffs, they are not identical. The nationwide class potentially includes many members from states that do not permit damages actions. Thus, a significant portion of the nationwide class seeks injunctive relief only. In these circumstances, it is appropriate to certify two separate classes under Rules 23(b)(2) and 23(b)(3)." *Id.*; *Cohen v. Chicago Title Ins. Co.*, 242 F.R.D. 295, 301 (E.D. Pa. 2007) (rejecting argument that plaintiff sought primarily monetary damages and certifying Rule 23(b)(2) and (b)(3) classes, as "[a]ny remedy could include both money damages and enjoining the conduct"); *Wilson v. County of Gloucester*, 256 F.R.D. 479, 491–92 (D.N.J. 2009) ("certifying the equitable portion of this suit under (b)(2), and the damages portion under (b)(3), allows for the best of both worlds"); *see also id.* at n.21 (collecting cases).[55]

"The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360

---

argument and declined to adopt a "bright-line test," explicitly rejecting the cursory Rule 23(b)(2) analysis in *In re Flash Memory Antitrust Litig.*, No. 07–0086, 2010 WL 2332081, at *7 (N.D. Cal. June 9, 2010), the only other indirect purchaser case Celgene cites for this sweeping proposition. *Processed Egg*, 312 F.R.D. at 166 ("Instead, the Court believes that when a Rule 23(b)(2) class is proposed alongside Rule 23(b)(3) classes, the correct approach is to rigorously analyze whether the proposed class is appropriate, especially in light of the potential res judicata effects of any judgment.").

[55] Frequently, "courts separately certify *both* a (b)(2) class for the portion of the case concerning injunctive and declaratory relief *and* a (b)(3) class for the portion of the case requesting monetary damages." 2 Newberg on Class Actions § 4:38 (5th ed.) (collecting cases); *see, e.g.*, *Raffin v. Medicredit, Inc.*, No. 15-4912, 2017 WL 131745, at *10 (C.D. Cal. Jan. 3, 2017); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 117 (E.D.N.Y. 2012); *Seekamp v. It's Huge, Inc.*, No. 09-00018, 2012 WL 860364, at *8 (N.D.N.Y. Mar. 13, 2012); *Easterling v. Connecticut Dep't of Correction*, 278 F.R.D. 41, 51 (D. Conn. 2011); *Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 173–74 (S.D.N.Y. 2011).

(2011); *Weiss v. New York Hosp.*, 745 F.2d 786, 811 (3d Cir. 1984) ("When a suit seeks to define the

relationship between the defendant(s) and the world at large ... (b)(2) certification is appropriate.").

"The purpose of relief in an antitrust case is 'so far as practicable, (to) cure the ill effects of the

illegal conduct, and assure the public freedom from its continuance.'" *United States v. Glaxo Grp. Ltd.*,

410 U.S. 52, 64 (1973). Here, Celgene's wrongful conduct to foreclose generic competition has

distorted competitive market forces, thereby allowing it to charge supra-competitive prices to the

continued detriment of end-payors nationwide – not just those who are members of the Damages

Class. An injunction that forces Celgene to cease any anticompetitive conduct is essential to prevent

further injuries. Thus, injunctive relief is an important aspect of the relief sought by Plaintiffs, readily

satisfying Rule 23(b)(2).

### III.  CONCLUSION

Certification of the Classes is appropriate where, as here, the alternative is "scores of

individual lawsuits [that] would rely on similar evidence and proof." *Processed Egg*, 312 F.R.D. at 203-

04. The "vast majority of district courts" have held that class action treatment is superior to other

methods of adjudication in similar end payor class actions. *Flonase*, 284 F.R.D. at 234; *Nexium*, 777

F.3d at 23 ("The plaintiff class members in this case appear to be the very group that Rule 23(b)(3)

was intended to protect.").

Dated: May 18, 2018                       By: *Melinda R Coolidge*

Melinda R. Coolidge
Walter D. Kelley, Jr.
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200
mcoolidge@hausfeld.com
wkelley@hausfeld.com

Brent W. Landau
Katie R. Beran

**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
(215) 985-3270
blandau@hausfeld.com
kberan@hausfeld.com

Whitney E. Street
**BLOCK & LEVITON LLP**
610 16th Street, Suite 214
Oakland, CA 94612
(415) 968-1852
wstreet@blockesq.com

Stephen Teti
**BLOCK & LEVITON LLP**
155 Federal Street, Suite 400
Boston, MA 02110
(617) 398-5600
steti@blockesq.com

Frank R. Schirripa
Daniel B. Rehns
John A. Blyth
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Avenue, 10th Floor
New York, NY 10016
(212) 213-8311
fschirripa@hrsclaw.com
drehns@hrsclaw.com
jblyth@hrsclaw.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed
Classes*

James Notis
Jennifer Sarnelli
**GARDY & NOTIS, LLP**
560 Sylvan Avenue
Englewood Cliffs, NJ 07632
jnotis@gardylaw.com
jsarnelli@gardylaw.com

Jeffrey A. Barrack
Jeffrey B. Gittleman
**BARRACK, RODOS & BACINE**
330 Two Commerce Square
2001 Market Street

Philadelphia, PA 19103
jgittleman@barrack.com

Todd A. Seaver
Christopher T. Heffelfinger
**BERMAN TABACCO**
44 Montgomery Street
Suite 650
San Francisco, CA 94104
(415) 433-3200
tseaver@bermantabacco.com

*Additional Plaintiffs' Counsel*

37