**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**


**HIGHLY CONFIDENTIAL-TO BE FILED UNDER SEAL
SUBJECT TO PROTECTIVE ORDER**


| | |
|---|---|
| **IN RE THALOMID AND REVLIMID LITIGATION** | Civil No. 14-6997 (MCA) (MAH) |


**CLASS PLAINTIFFS' SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................................1

II.  ARGUMENT ......................................................................................................................1

A.  Celgene's Manufactured Quibbles with the Proposed Alternative Third Party Payor Class Cannot Defeat Class Certification ..........................................................................................1

    1.  ██████████████████████████████████████████ ██████ Is Unsupported and Beyond Unlikely ..............................................2

    2.  If Celgene Ever Demonstrates that PBMs Incurred Any of the Damages Caused by its Conduct, Dr. Leitzinger Has Provided a Reliable Methodology to Reduce Aggregate Damages on a Classwide Basis ..........................................................................................3

B.  The Damages Classes Including Consumers Also Satisfy Rule 23(b)(3) ...........................6

    1.  Even "Brand Loyalists" and Flat Copayers Were Impacted by Lack of Choice ............6

    2.  *De Minimis* Flat Copays Do Not Defeat Predominance .............................................10

    3.  The Small Number of Potential Brand-Only Purchasers Does Not Cause Individualized Issues to Predominate ..................................................................................................10

        a.  The Consumer Delay Class Reliably Excludes Most Brand Loyalists ...........................12

        b.  ████████████████████████████████████ Provides Another Way to Define a Class ..................................................................................................................14

        c.  Celgene's Position on Identifying Uninjured Class Members Is Inconsistent with *Tyson, Halliburton,* and *City Select* ..........................................................................................15

C.  The Court Should Certify the Injunction Class Under Rule 23(b)(2) ................................17

    1.  Plaintiffs Have Proposed a Clear Definition of the Injunction Class ...........................17

    2.  The Proposed Injunction Class is Cohesive ...............................................................19

    3.  Classwide Relief Would Provide a Meaningful Benefit to Class Members .................19

III.  CONCLUSION ..................................................................................................................20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)..................................................................................................8

*Bereket v. Portfolio Recovery Assocs., LLC*,
    2018 WL 6266606 (W.D. Wash. Nov. 30, 2018).................................................13

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946)..............................................................................................17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)................................................................................................7

*Byrd v. Aaron's Inc.*,
    784 F.3d 154 (3d Cir. 2015).................................................................................12

*Carey v. Population Servs., Int'l*,
    431 U.S. 678 (1977)................................................................................................9

*Castro v. Sanofi Pasteur Inc.*,
    134 F. Supp. 3d 820 (D.N.J. 2015)....................................................................3, 6

*City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*,
    867 F.3d 434 (3d Cir. 2017).......................................................................... 15, 16

*Deborah Heart & Lung Ctr. v. Penn Presbyterian Med. Ctr.*,
    2011 WL 6935276 (D.N.J. Dec. 30, 2011) .......................................................7, 8

*Ebert v. General Mills*,
    823 F.3d 472 (8th Cir. 2016)...............................................................................13

*Fosmire v. Progressive Max Ins. Co.*,
    277 F.R.D. 625 (W.D. Wash. 2011).....................................................................19

*Gates v. Rohm & Haas Co.*,
    655 F.3d 255 (3d Cir. 2011).................................................................................19

*Gayle v. Warden Monmouth Cty. Corr. Inst.*,
    838 F.3d 297 (3d Cir. 2016).................................................................................20

*Gonzalez v. Corning*,
    885 F.3d 186 (3d Cir. 2018).................................................................................20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ................................................................ 15, 16

*In re Blood Reagents Antitrust Litig.*,
2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) ............................... 13

*In re Domestic Air Transp. Antitrust Litig.*,
137 F.R.D. 677 (N.D. Ga. 1991) ................................................. 12

*In re Flonase Antitrust Litig.*,
284 F.R.D. 207 (E.D. Pa. 2012) ................................................. 14

*In re Lidoderm Antitrust Litig.*,
2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ............................... 4, 5

*In re Nexium (Esomeprazole) Antitrust Litig.*,
297 F.R.D. 168 (D. Mass. 2013) ................................................... 5

*In re Processed Egg Prods. Antitrust Litig.*,
312 F.R.D. 171 (E.D. Pa. 2015) ................................................. 6, 18

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004) ................................................. 14

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ................................................................... 6, 16

*Kohen v. Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) ......................................................... 3

*Kotsur v. Goodman Glob., Inc.*,
2016 WL 4430609 (E.D. Pa. Aug. 22, 2016) .............................. 19

*Laumann v. National Hockey League*,
105 F. Supp. 3d 384 (S.D.N.Y. 2015) ....................................... 9, 19

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ..................................................................... 8

*Marchese v. Cablevision Sys. Corp.*,
2010 WL 3311842 (D.N.J. Aug. 18, 2010) ................................... 7

*Montes v. Brezenoff*,
85 F.R.D. 130 (S.D.N.Y. 1980) .................................................. 20

*Nat'l Coll. Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) ....................................................................... 8

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
 508 U.S. 656 (1993) ........................................................................................................... 9

*Neale v. Volvo Cars of N. Am., LLC,*
 794 F.3d 353 (3d Cir. 2015) .............................................................................................. 6

*Obergefell v. Hodges,*
 135 S. Ct. 2584 (2015) ...................................................................................................... 9

*Rossi v. Standard Roofing, Inc.,*
 156 F.3d 452 (3d. Cir. 1998) ............................................................................................ 6

*S.R., by & through Rosenbauer v. Pa. Dep't of Human Servs.,*
 325 F.R.D. 103 (M.D. Pa. 2018) ...................................................................................... 18

*Shelton v. Bledsoe,*
 775 F.3d 554 (3d Cir. 2015) .............................................................................................. 17

*Shook v. Bd. of Cty. Comm'rs of Cty of El Paso,*
 543 F.3d 597 (10th Cir. 2008) .......................................................................................... 18

*Smith v. SIMM Assocs., Inc.,*
 2018 WL 389089 (E.D. Wis. Jan. 12, 2018) .................................................................... 13

*Spuhler v. State Collection Servs., Inc.,*
 2017 WL 4862069 (E.D. Wis. Oct. 26, 2017) .................................................................. 13

*Tyson Foods, Inc. v. Bouaphakeo,*
 136 S. Ct. 1036 (2016) .............................................................................................. 15, 16

*United States v. Virginia,*
 518 U.S. 515 (1996) ........................................................................................................... 9

*Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.,*
 453 F.3d 179 (3d Cir. 2006) .............................................................................................. 17

*Wenig v. Messerli & Kramer P.A.,*
 2013 WL 1176062 (D. Minn. Mar. 21, 2013) .................................................................. 13

*Yates v. Collier,*
 868 F.3d 354 (5th Cir. 2017) ............................................................................................ 18

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
 395 U.S. 100 (1969) ........................................................................................................... 6

**Rules & Statutes**

Fed. R. Civ. P. 23(a) ............................................................................................................. 17

Fed. R. Civ. P. 23(b) ................................................................................................ 9, 17, 18

Fed. R. Civ. P. 23(c) ........................................................................................................ 17

Fed. R. Civ. P. 65(d) ....................................................................................................... 18

**Other Authorities**

Report of the Standing Committee on Rules of Practice and Procedure (2002) ................................... 17

## I.     INTRODUCTION

Embracing the opportunity to address the issues raised by the Court, Plaintiffs demonstrated in their renewed motion that there are various options to account for brand loyalists and flat copayers that do not entail denying every other class member the right to recovery. Plaintiffs have previously proposed several revised class definitions and offer one new exclusion suggested by Celgene's expert. Further support has been provided for the originally proposed classes, including the Injunction Class.[1] Meanwhile, Celgene's determination to block certification leads it to rehash issues already decided by the Court.[2] Plaintiffs seek certification of the proposed classes to ensure the broadest group possible is entitled to compensation for the harm caused by Celgene's conduct.[3]

## II.    ARGUMENT

### A.  Celgene's Manufactured Quibbles with the Proposed Alternative Third Party Payor Class Cannot Defeat Class Certification

Plaintiffs demonstrated that a class limited to third party payors (TPPs) meets the requirements of Rule 23, specifically addressing the Court's concerns about brand loyalists and flat copay consumers by removing all consumers from a proposed TPP class. In response, Celgene makes only two arguments. First, ██████████ hypothesizes that there might be some small TPP class member who had the poor luck of insuring *only* brand loyalists. ██████████████ anything is possible – but hypothetical possibilities do not defeat class certification. Second, Celgene misrepresents Dr. Leitzinger's opinion, claiming he "conceded" that a PBM actually paid in part for

---

[1] Celgene dropped its due process argument, apparently concedes the state law variation issue is moot, and paradoxically endorses using the broadest class definition possible. Celgene's Memo in Opp. to Class Pls' Renewed Mot. for Class Certification ("Def. Supp.") at 17.

[2] Class Certification Opinion (Oct. 30, 2018) (ECF No. 250) ("Op.") at 27-29, 47-50; *see also* Ex. 135 (January 4, 2019 letter from Plaintiffs' counsel to Celgene's counsel discussing this Court's opinion).

[3] On January 14, 2019, the U.S. House Committee on Oversight and Reform announced an investigation into the actions of 12 drug companies for "aggressively increasing prices on existing drugs" while "recording windfall profits." Ex. 136, Jan. 14, 2019 Press Release; Ex. 137, Recipient List. The Committee is seeking "information and communications on price increases" from Celgene, as well as "corporate strategies to preserve market share and pricing power." Ex. 136.

Revlimid. Dr. Leitzinger merely showed that he could reliably decrease his aggregate damages calculation (in response to Celgene's *merits* argument) to ensure that TPPs do not recover more damages than they sustained. Thus, at a minimum, the Court should certify a TPP-only class.

1.   **Unsupported and Beyond Unlikely**

Dr. Leitzinger demonstrated ████████████████████ that the vast majority of purchases after generic entry would be for generic Thalomid and Revlimid. Specifically, he estimated that TPPs have a 90% chance of injury on the first prescription, increasing to 99% and 99.9% on the second and third.[4] ███████████████████████

████ in order to avoid receiving a bioequivalent generic.

---

[4] Leitzinger Decl., n.64 (Oct. 2, 2017); Leitzinger Reb., n.101 (May 18, 2018).



█████.[11] In fact, the lone example ████████████████████████████████ –

████████████████████████          ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ █    ████████████████████████████████

█████████████████████████████████████[13] As Dr. Leitzinger has shown,

TPPs that paid for Thalomid or Revlimid during the class period are extremely likely to have paid

for at least one generic in the but-for world.[14] Celgene's hypotheticals cannot defeat the plaintiffs'

showing that all or virtually all TPPs in the class were impacted by Celgene's conduct. Op. at 50.

> **2. If Celgene Ever Demonstrates that PBMs Incurred Any of the Damages Caused by its Conduct, Dr. Leitzinger Has Provided a Reliable Methodology to Reduce Aggregate Damages on a Classwide Basis**

In a desperate attempt to defeat certification of a TPP class that is untouched by the few

issues left open by the Court,[15] Celgene misrepresents Dr. Leitzinger's merits opinion on PBMs and

damages, regurgitating an argument that this Court has already rejected.[16] Op. at 50. ████████████

████████████████████████████████████████████████████████████████████

████████████████████

█████████████████████████████████████████████████████████████████████████

█████████ █                                                            █████

█████████████████████  But even if there were a TPP that escaped injury, "[t]he existence of
occasional outliers does not defeat predominance." *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820,
847 (D.N.J. 2015) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)); *Kohen v.
Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("a class will often include persons who have
not been injured . . . Such a possibility or indeed inevitability does not preclude class certification")).
[12] Ex. 34 to Celgene's Memo in Opp. to Class Pls' Mot. for Class Certification ("Def. Opp.") (ECF
No. 182-16) (switching from Vagifem to generic Yuvafem).
[13] Ex. 98 to Class Pls' Memo in Supp. of Mot. for Class Certification ("Pls' Mem.") (ECF No. 150-
6), ██████████████████, at 61. Thus, even hypothetical TPPs with only brand class loyalist members
– should any actually exist – would be injured because in the but-for world they would be able to
implement similar policies that shift the extra cost to those brand loyalist consumers.
[14] Leitzinger Decl., n.64 (Oct. 2, 2017); Leitzinger Reb., n.101 (May 18, 2018).
█████████████████████████████████████████████████████████████████████████
[16] Thus, Celgene – not Plaintiffs – is the party moving for reconsideration. Def. Supp. at 6-7.

██████████████████████████████████████████████████████████

████████████████████████████████████[17]███████████████████

████████████████████████████████████████[18] Celgene's speculations

to the contrary remain just that. *See In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at * 7 (N.D. Cal.

Feb. 21, 2017) (discussing Dr. Hughes's opinions regarding PBMs, finding "defendants identify a

general, theoretical risk without substantiating the true impact (if any) of that risk.").



Despite Celgene's suggestion otherwise, this adjustment to aggregate damages does not

---

[17] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[21] Def. Supp. Ex. 2 (Leitzinger Reb. at ¶ 35 (Oct. 29, 2018)); Leitzinger Reb. at ¶ 16 (Feb. 15, 2019).

create an issue of predominance or impact, because PBMs are excluded from the class (so whether they were impacted is irrelevant); as the Court already noted, the issue relates only to the "classwide damages model." Op. at 49; *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 179 (D. Mass. 2013) (addressing Dr. Hughes's erroneous contention that PBMs might be class members by explicitly excluding PBMs); *Lidoderm*, 2017 WL 679367, at *20-21 (rejecting Dr. Hughes's argument that PBM involvement in the pharmaceutical industry may have eliminated impact to TPP class members). Plaintiffs have demonstrated impact on all or virtually all the TPP class members.



- Mr. DeBree explained that PBMs do not pay for prescription drugs themselves (they act as intermediaries between pharmacies and TPPs).[24]

- Regulations forbid PBMs from paying any non-negligible amounts on prescription drugs.[25]

---

[22] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ emphasis added); Op. at 9-10 (citing same). Mr. DeBree agreed that the typical spread model results in the TPP paying more to the PBM than the PBM pays to the pharmacy, and did ***not*** agree that there was any evidence of a PBM paying for Thalomid or Revlimid. Decl. of W. Paul DeBree ("DeBree Decl.") (ECF No. 210-4) in Supp. of Class Pls' Reply Memo in Supp. of Mot. for Class Certification ("Pls' Reply") at ¶ 16.

[23] Op. at 28-29 ("any amounts that such Plan Sponsors received in coverage or in the form of rebates is irrelevant to the question of impact.").

[24] DeBree Decl. at ¶ 3; Ex. 140, Excerpts from the Jan. 16, 2019 Deposition of W. Paul DeBree ("DeBree Dep.") at 81:17-19 ("There is no payment by the PBM for any part of the purchase of Thalomid or Revlimid."). Celgene is also wrong that "[i]t is undisputed" that PBMs pay for Thalomid and Revlimid and then collect from the TPP. Def. Supp. at 4. Mr. DeBree explained that all payments are with TPP dollars. DeBree Decl. at ¶ 43.

[25] Ex. 141, Express Scripts 2016 Form 10-K at 12 ("[I]f a PBM offers to provide prescription drug

- ███████████████████████████████████████████████[26]

- PBMs state that any discrepancies between estimated and actual collections from TPPs through aggregated spread pricing or performance guarantees were immaterial.[27]

Celgene has no "new evidence" that Plaintiffs' aggregate damages estimate is not

"reasonabl[y] accura[te] in the aggregate." *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171,

202-03 (E.D. Pa. 2015); *Sanofi Pasteur*, 134 F. Supp. 3d at 849 (approving Dr. Leitzinger's aggregate

class-wide damages model). A class damages model in an antitrust case "need not be exact." *Id.* A

"reasonable estimate" of damages is sufficient. *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 484 (3d.

Cir. 1998). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense

of his victim." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969); *J. Truett Payne Co.

v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) ("[I]t does not come with very good grace for the

wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.").[28]

### B. The Damages Classes Including Consumers Also Satisfy Rule 23(b)(3)

#### 1. Even "Brand Loyalists" and Flat Copayers Were Impacted by Lack of Choice

Celgene concedes that "a reduction of consumer choice has been recognized as an

anticompetitive effect of an antitrust violation," and does not dispute that its conduct has deprived

all consumers of the opportunity to choose between branded Thalomid and Revlimid and their

generic equivalents. Def. Supp. at 19. While these concessions are dispositive of the simple question

---

coverage [] or otherwise accepts material financial risk in providing the benefit, various … laws may require … the party at risk establish reserves or otherwise demonstrate financial responsibility.").
[26] ███████████████████████████████████████████████

[27] Ex. 141, Express Scripts 2016 Form 10-K at 52; Ex. 140, DeBree Dep. at 100:22-101:7.
[28] Further, contrary to Celgene's argument (Def. Supp. at 9), even if damages were individualized, "it is a misreading of *Comcast* to interpret it as precluding certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 (3d Cir. 2015) (quotations omitted).

of whether "brand loyalists" are impacted by Celgene's conduct, Celgene nevertheless maintains that the anticompetitive effects of *all* consumers being denied choices may be ignored because (1) lack of choice is somehow not an "antitrust injury"; (2) choice is totally irrelevant to consumers who would have ultimately selected the brand; and (3) classwide lack of choice only supports certification of Rule 23(b)(2) classes. Celgene is wrong on all three points.

*First,* reduced consumer choice is indeed an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This Court has expressly held as much,[29] and Celgene completely ignores two Court of Appeals cases cited by Plaintiffs to the same effect.[30] This does not "conflate" the concept of an antitrust violation with a plaintiff's injury, as Celgene wrongly contends, because as *Brunswick* teaches, a plaintiff's antitrust injury is necessarily linked to a violation's anticompetitive effects. If a lack of consumer choice is an anticompetitive effect – as the law makes clear and as Celgene concedes – then consumers denied those choices *by definition* suffer an antitrust injury.

Celgene attempts to avoid the straightforward application of this principle by insisting that in certain cases where lack of choice was identified as an anticompetitive effect, the plaintiff sought damages based on some other measure. But that should be entirely unsurprising, since in those cases the plaintiffs were not the consumers deprived of choices, but rather different market participants

---

[29] *See* Motion to Dismiss Opinion (Oct. 29, 2015) (ECF No. 68) ("reduced consumer choice and increased price constitute antitrust injury when caused by anti-competitive practices"); *Deborah Heart & Lung Ctr. v. Penn Presbyterian Med. Ctr.*, 2011 WL 6935276, at *8 (D.N.J. Dec. 30, 2011) ("even if these higher prices were not credited as antitrust injuries, Plaintiff has plausibly alleged meaningful competitive harms to consumer choice"); *Marchese v. Cablevision Sys. Corp.*, 2010 WL 3311842, at *2 (D.N.J. Aug. 18, 2010) (finding "Plaintiff has sufficiently alleged an antitrust injury" for arrangement that "harmed Plaintiff and members of the Class by limiting consumer choice").

[30] Class Pls' Supp. Memo in Support of Mot. for Certification ("Pls' Supp.") at 9 (citing *Ross v. Bank of Am.*, 524 F.3d 217 (2d Cir. 2008); *Glen Holly Entm't, Inc. v. Tektronix*, 352 F.3d 367 (9th Cir. 2003)).

that needed to show an *additional* antitrust injury that affected them specifically.[31] Here, where the consumers *are* the plaintiffs, there is no need for this extra step.

   *Second*, the opportunity to make a choice matters regardless of which choice one makes. Perhaps some (very few) consumers would opt to purchase the brand over the generic, but the perniciousness of Celgene's conduct ensured *no* consumer was *ever* allowed to make that choice. Because the choice to take branded Thalomid or Revlimid despite the availability of a generic could cost a consumer thousands of dollars a month and require them or their relatives to ████████████ ████████████ raise as much as $180,000 annually to cover the price difference, it surely is not a decision any consumer would take lightly,[32] and it is no answer to say that a cancer patient who struggles with and makes this choice may as well have been given no options at all.[33]

   While "providing consumers with a free choice" is "a basic antitrust objective," *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 926-27 (2007) (Breyer, J., dissenting), the importance of denied opportunities is not limited to antitrust. And in other areas of law, it is well-established that harm flows from the denial of the opportunity itself, not on what may or may not have followed from the exercise of that opportunity:

> When the government erects a barrier that makes it more difficult for members of
> one group to obtain a benefit than it is for members of another group, [one] . . . need
> not allege that he would have obtained the benefit but for the barrier in order to
> establish standing. The "injury in fact" . . . is the denial of equal treatment resulting
> from the imposition of the barrier, not the ultimate inability to obtain the benefit.

---

[31] *See, e.g.*, *Deborah*, 2011 WL 6935276, at 9 (patients lost choices, but the plaintiff was a hospital that lost revenues as a result); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-11 (1985) (consumers were denied choices, but the plaintiff was a ski operator that lost business as a result); *Nat'l Coll. Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 95-97 (1984) (students and fans were deprived of choice, but the plaintiffs were colleges as to which the district and appellate courts had already found antitrust injury). In *Deborah*, the court noted that while consumers were also harmed by their loss of choice, they were "less likely to sue for this type of violation, absent a class action." 2011 WL 6935276, at *4.
█
█
████████████████████████████████████████████████

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see also United States v. Virginia*, 518 U.S. 515, 542 (1996) (unconstitutional denial of opportunity for women to attend Virginia Military Institute even though "most women would not choose VMI's adversative method"); *Obergefell v. Hodges*, 135 S. Ct. 2584, 2599, 2602 (2015) (upholding "the right to personal choice regarding marriage," noting that "exclusion from that status has the effect of teaching that gays and lesbians are unequal in important respects"); *Carey v. Population Servs., Int'l*, 431 U.S. 678, 685 (1977) ("The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices.").

*Third*, the fact that all consumers are impacted by lack of choice supports certification not just of a Rule 23(b)(2) class but a (b)(3) class as well. The court in *Laumann v. National Hockey League*, 105 F. Supp. 3d 384 (S.D.N.Y. 2015), granted certification only of a (b)(2) class because the court had separately excluded the plaintiffs' damages model on *Daubert* grounds, and the plaintiffs conceded that with no damages model, no (b)(3) class could be certified. *Id.* at 398-99 & n.57. But the court's explanation that all class members were injured by lack of choice is equally applicable to Rule 23(b)(2) and (b)(3) classes, because it goes to the issue of classwide *injury* – a requirement for both types of classes and the exact concern raised in that Court's prior opinion:

> Here, every class member has suffered an injury, because every class member, as a consumer in the market for baseball or hockey broadcasting, has been deprived of an option—a la carte channels—that would have been available absent the territorial restraints ("Injury One"). On top of this general injury, certain class members have also suffered the additional injury of having to pay too much for the content they wanted ("Injury Two"). . . . Injury One unites the class. The restriction of consumer options is an *ipso facto* antitrust harm, and conversely, the creation of new options is a benefit to the market as a whole. This is true for all consumers—even consumers, like league-wide fans, who are not interested in new options. . . . Put simply, Injury One is universal.

*Id.* at 401-02; *id.* at 400 ("there is no question that here, a common injury exists in the form of diminished consumer choice"). As in *Laumann*, consumers here suffered two injuries: virtually all paid higher prices, but *all* experienced lack of choice due to Celgene's conduct. Regardless of the

number of class members who paid higher prices, the injury from lack of choice is "universal," even for those that may not have been interested in the option to purchase something different.

### 2. *De Minimis* Flat Copays Do Not Defeat Predominance

Flat copays are disfavored (because TPPs have an incentive to drive their members to generic), such that fewer than 4.2% of class members are estimated to have had them.[34] And Celgene does not dispute that those with plans known to include flat copays can be explicitly excluded to *halve that percentage*.[35] Because they did not pay overcharges, including or excluding flat copayers does not alter the aggregate damages.[36] But it is incorrect to add this 2% to the percent of potential "brand loyalists." ██████████████ these groups would likely overlap,[37] as flat copayer patients are the least likely to care whether they get a brand or generic drug, given that they would pay the same amount.[38] This *de minimis* number does not cause individual issues to predominate.

### 3. The Small Number of Potential Brand-Only Purchasers Does Not Cause Individualized Issues to Predominate

Putting aside that brand-only purchasers were injured because Celgene's conduct denied all consumers the opportunity to choose between brand and generic, the small percentage of class members who may have purchased *only* the brand is too small to cause individual issues to predominate. The evidence demonstrates how difficult it would be for consumers to avoid purchasing a generic at least once. *See* Op. at 27 ("antitrust injury occurs on the first overcharge").

- Generic substitution laws cause pharmacies to automatically provide generic instead of brand unless a doctor has written "dispense as written" (which the doctor would need to do for

---

[34] Pls' Supp. at 10. This Court has previously recognized the significance of TPP incentive programs that encourage consumers to choose generics. Op. at 27.

[35] Pls' Supp. at 10; Leitzinger Supp., ¶ 12 (Dec. 14, 2018).

[36] Leitzinger Supp., n.11 (Dec. 14, 2018); ██████████████████████████████
██████████████████████████████████████████████ Leitzinger Reb., ¶ 21 (Feb. 15, 2019).

[38] ████████████████████████████

*each* prescription to ensure the patient *never* received a generic);[39]

- TPPs commonly institute policies like tiered copays that drive consumers to generics through pricing incentives, and coinsurance for specialty drugs like Thalomid and Revlimid;[40]

- 79% of TPPs have step therapy policies that require consumers to try generic if available,[41] which may require consumers or doctors to call the insurance company and explain why brand is necessary and request a manual waiver of the generic requirement;[42] and some of which require the consumer who insists on brand to cover the difference in cost between generic and brand ($7,000/month for Revlimid instead of a $3 generic copay);[43] and

- Uninsured consumers could pay as much as $15,000 for brand Revlimid per month.[44]

Celgene and Dr. Hughes suggest that "brand loyalists" consist of an immutable class of consumers that *never* purchase generic drugs. But an increasing generic penetration rate that eventually exceeds 99% tells a different story.[45] *See* Leitzinger Supp., ¶¶ 5-9 (Dec. 14, 2018).[46] ████

████████████████████████████ diehard "brand loyalists"[47] would be injured if forced to purchase the generic because a pharmacy ran out of stock of brand or a TPP required the use of generic drugs.[48] Dr. Leitzinger opines that true "brand loyalists" account for 1% or less of the

---

[39] Pls' Mem. at 43 (discussing automatic generic substitution); Leitzinger Decl., ¶ 14 (Oct. 2, 2017); ███████████████████████████████████████████████████████████

[40] Pls' Reply at 19 (citing numerous examples).
[41] Leitzinger Reb., n.45 (Feb. 15, 2019).
[42] ███████████████████
[43] Ex. 98 to Pls' Memo, ██████████████████████████████████████████ ████████████████████████████████

[44] Ex. 142, ThalRev_LOCAL39_000164.
[45] Leitzinger Decl. Ex. 5 (Oct. 2, 2017). ███████████████████████████████████

[46] Although Celgene suggests that Dr. Leitzinger's opinion in his supplemental report is new, he has interpreted the data consistently since his very first deposition. *See* Ex. 143, Jan. 24, 2018 Deposition of Jeffrey J. Leitzinger at 81:1-82:3; Leitzinger Reb. ¶ 4 (Feb. 15, 2019). ████████████████ ████████████████████████████████████████

[47] *See infra* n. 9 and 10;
[48] ██████████████████████████████████████████████

market.[49] However, to further reduce the number of potential brand-only purchasers, Plaintiffs alternatively proposed certifying the class with later start dates for consumers.

### a. The Consumer Delay Class Reliably Excludes Most Brand Loyalists

As explained in Plaintiffs' renewed motion, the proposed "Consumer Delay Class" is composed of TPPs with relevant transactions as of the original class period start date, plus consumers beginning 10 quarters later, when generic penetration reaches 97.5% (and continues increasing thereafter).[50] Because generic penetration increases over time, by carving out consumers' purchases at the early stages of generic entry, the number of allegedly uninjured class members decreases to an indisputably *de minimis* number (2.5% and decreasing over time).[51] *See In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 683 n.5 (N.D. Ga. 1991) ("The act of refining a class definition is a natural outcome of federal class action practice. . . . It is not surprising that plaintiffs have revised the class definition to reflect the progress of discovery.").

Faced with this solution, Celgene flipped its argument and claimed to be "troubl[ed]" that those early purchases were left out of the class.[52] But the Third Circuit has explicitly rejected imposition of an "underinclusivity" standard as part of class certification. *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 166-67 (3d Cir. 2015) (rejecting argument that "the proposed class definition did not encompass all [potentially affected] individuals" and finding plaintiffs were not required "to include all individuals who may have been harmed by a particular defendant").

---

[49] Leitzinger Supp., ¶ 7 (Dec. 14, 2018); Leitzinger Reb., ¶¶ 3-4 (Feb. 15, 2019).

[50] *See* Ex. 130A (amended version of Ex. 130 to Pls' Supp.)
[51] Pls' Supp. at 2. This is not "magic" (Def. Supp. at 17) –
[52] Def. Supp. at 17.

It is true that any consumers who purchased Thalomid or Revlimid prior to the start of the Consumer Delay class period would have the right to bring their own claim against Celgene. However, Celgene cannot explain why a narrower class definition (still encompassing at least ▮▮▮▮▮ *class members*) would not be "superior to other available methods for fairly and efficiently adjudicating the controversy." Def. Supp. at 16 (arguing that it would not be "fair" or "efficient" to certify a class that did not include everyone with a potential claim).[53] But if neither of the proposed classes with consumers is certified, as Celgene desires, then *all* the efficiencies of a class action would be eliminated (because all ▮▮▮▮ class members would have to bring separate lawsuits). *See In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *35 (E.D. Pa. Oct. 19, 2015) ("If the class were not certified, 'the numerous individual class members would be forced to file suit individually, producing numerous identical issues in each case that would waste judicial resources and leave all parties vulnerable to unfair inconsistencies.'") (citation omitted).

Dr. Leitzinger used nine other oral cancer drugs to derive the generic penetration rates.[54] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[55] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[53] The unreported Minnesota district court case that Celgene cites, *Wenig v. Messerli & Kramer P.A.*, 2013 WL 1176062 (D. Minn. Mar. 21, 2013), has repeatedly been called into question. *See, e.g.*, *Bereket v. Portfolio Recovery Assocs., LLC*, 2018 WL 6266606, at *6 (W.D. Wash. Nov. 30, 2018) (disagreeing with *Wenig*, certifying narrowed class, and holding that "the purpose of the superiority analysis is not to define the largest possible class"); *Smith v. SIMM Assocs., Inc.*, 2018 WL 389089, at *4 (E.D. Wis. Jan. 12, 2018) (same); *Spuhler v. State Collection Servs., Inc.*, 2017 WL 4862069, at *7 (E.D. Wis. Oct. 26, 2017) (same). In addition, the case is inapposite: the court criticized plaintiffs' counsel for filing serial separate cases on behalf of "artificially narrowed" classes limited to particular counties to circumvent the statutory cap on damages, and explicitly stated that its ruling "is not to say that a proposed class must always include all possible class members." *Id.* at *6. Further, *Ebert v. General Mills*, 823 F.3d 472 (8th Cir. 2016) does not reference narrowed class definitions as Celgene claims.

[54] *See* Op. at 6 (citing Leitzinger Decl. at ¶ 63).

[55] Ex. 145, Excerpts from the May 10, 2018 Deposition of James W. Hughes ("Hughes 2018 Dep.") at 123:21-23, 125:17 ("assuming" that REMS caused the slower generic penetration while admitting "I am not forming an independent opinion on whether or not there is a causal relationship" between



[56] Celgene's documents confirm Dr. Leitzinger's opinion. Ex. 146,

*See also* Leitzinger Reb., n.47 (Feb. 15, 2019).

Despite this evidence,

[57] Plaintiffs have not heard of such a survey technique being used in other end payor class actions, whereas courts have repeatedly approved the use of benchmarking (often referred to as a "yardstick" methodology). *See In re Flonase Antitrust Litig.,* 284 F.R.D. 207, 225 (E.D. Pa. 2012) (yardstick methodology "establish[es] impact to this class of consumers and TPPs through class-wide evidence"); *In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 699 (S.D. Fla. 2004) (yardstick model is "widely accepted and [has] been used in numerous other antitrust class actions"). It is unclear why survey responses (what people *say*) would be more reliable than benchmarking analysis (what people *have done*) when ████████ and Dr. Leitzinger ████ that ████████████████████████[58]

**b.** ████████████████████████ **Provides Another Way to Define a Class**

████████████████████████████ demonstrates why the Consumer Delay class would reliably exclude

the penetration rate and the fact of being on REMS). *See also* ████

[56] Leitzinger Reb. ¶ 20 (Feb. 15, 2019).

brand loyalists (by moving the start date 2.5 years for consumers to carve out most of the purchases made by these alleged brand loyalists). ███████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ These patients are readily identifiable from Celgene's REMS data; some are listed by patient identifier in Exhibit 3 to Dr. Leitzinger's rebuttal report. Dr. Leitzinger has provided an alternative aggregate damages estimate reflecting this potential exclusion in Exhibit 4 to his report.

### c. Celgene's Position on Identifying Uninjured Class Members Is Inconsistent with *Tyson*, *Halliburton*, and *City Select*

Plaintiffs have addressed the Court's concerns regarding identification of uninjured class members, both by offering solutions (the TPP class, the Consumer Delay class, and the exclusion discussed above) that would eliminate or reduce (to an indisputably *de minimis* amount) the number of "uninjured" class members, and by further demonstrating why these classes should be certified under *Tyson*, *Halliburton*, and *City Select*. Celgene has failed to explain why these cases do not apply (and has not pursued the argument that its due process rights would be infringed by certification).

In *Tyson*, there were **no actual records** of the amount of time that individual employees spent donning and doffing protective gear ("dressing") (to support their claim that they should have been paid overtime rates). *Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1046-49 (2016). As Celgene points out (Def. Supp. at 22), the plaintiffs in *Tyson* therefore relied on "*representative evidence*" – an expert's calculation of the *average* time spent dressing based on employee testimony and video recordings, which were then applied to every individual. *Id.* Those employees who were faster dressers than the average employee, and who therefore in fact may have worked fewer than 40 hours

---

█
████████████████████████████████████████████████████
███████████████████████████

(and escaped impact), would have recovered under the model approved by the Court. *Id.*

As in *Tyson*, here there are no actual records that would demonstrate who would have purchased generic Thalomid or Revlimid, because no one had the opportunity to purchase it due to Celgene's misconduct. Thus, Plaintiffs present representative evidence: an expert's calculation of the predicted number of prescriptions that would have converted to generic had one been available. Just as some employees were faster than average at dressing, some individuals might not have purchased generic Thalomid or Revlimid and thus not have saved money.[60] But we know that it is extremely likely that class members would have purchased a generic at least once. Under *Halliburton*, such a likelihood would entitle every individual class member to presumption of injury. 573 U.S. at 276.[61]

Because of Celgene's misconduct, no one had the opportunity to ***become*** a brand loyalist. "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne*, 451 U.S. at 566-67. But that does not mean that the defendant should be permitted to profit by his wrongdoing at the

---

[60] Like Celgene, Tyson argued that use of representative evidence deprived it of its ability to litigate individual defenses. The Supreme Court disagreed: "Since there were no alternative means for the employees to establish their hours worked petitioner's primary defense was to show that [the aggregate calculation] was unrepresentative or inaccurate. That defense is itself common to the claims made by all class members." *Tyson*, 136 S. Ct. at 1047.

[61] If the Court concludes that the small number of brand loyalists remaining must be identified to deny their recovery (they are already removed from aggregate damages), then affidavits can be used. *See City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 441-42 (3d Cir. 2017). Celgene argues that an affidavit "cannot be as simple as the inquiry in *City Select* (i.e., whether a consumer received the fax in question)." Def. Supp. at 18. But if the Third Circuit thought it was reasonable to ask a consumer if she remembered receiving a particular fax, surely it is reasonable to ask a consumer – who we know purchased brand – if she would have purchased generic, ███████████ ████████████████████████████████████████████████ The other questions that Plaintiffs provided as examples (Pls' Supp. at 19-20) were merely meant to bolster the reliability of the submission. The fact that a potential affidavit might have four questions instead of one is not a good reason to deviate from Third Circuit precedent on class certification. *See* Def. Supp. at 18; *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434 (3d Cir. 2017).

expense of his victim. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

### C.  The Court Should Certify the Injunction Class Under Rule 23(b)(2)

A 23(b)(2) class is appropriate where, like here, the defendant has "acted or refused to act on grounds generally applicable to the class." Op. at 51. The proposed Injunction Class (1) meets the requirements of Rule 23(a);[62] (2) is sufficiently cohesive; and (3) is *capable of* establishing clear class parameters as required by Rule 23(c)(1)(B). *See Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015). Despite Celgene's suggestions otherwise, "[n]o additional requirements need be satisfied." *Id.*

### 1.  Plaintiffs Have Proposed a Clear Definition of the Injunction Class

The third prong of a properly defined (b)(2) class is one that "is capable" of complying with Rule 23(c)(1)(B). *Shelton*, 775 F.3d at 563. Rule 23(c)(1)(B) states only that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses."[63] Plaintiffs have properly defined the class claims, issues, and defenses so that this Court can issue a "readily discernible, clear, and precise statement of the parameters defining the class" under Rule 23(c)(1)(B).[64] *Shelton*, 775 F.3d at 563. The relevant claims, issues, and defenses are limited to those implicated by Plaintiffs'

---

[62] The first *Shelton* prong is not disputed by Celgene, and this Court previously ruled that Plaintiffs satisfied Rule 23(a)'s requirements. Op. at 15-19.

[63] This Court found that the classes are properly defined in the context of its ascertainability analysis, and Celgene has never challenged the class definitions. Op. at 42.

[64] Rule 23(c)(1)(b) is designed to facilitate review of the class certification decision on interlocutory appeal and provide notice of the nature of the action to the class. *See Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 188-89 (3d Cir. 2006). An appellate court reviewing a certification order needs to know the parameters of the class, but it does not need to know the parameters of the relief sought. S*ee generally* Report of the Standing Committee on Rules of Practice and Procedure (published September 2002). Celgene misconstrues *Wachtel*, where the court admonished the use of '*inter alia*' in the context of an incomplete list of class issues and claims. *Id.* at 189. Nowhere in the Third Circuit's analysis does it discuss the *relief* sought.

federal claim under Section 16 of the Clayton Act.[65]

Celgene misapplies the requirements of Rule 65(d), claiming that Plaintiffs need to specifically define the injunctive relief sought at the class certification stage. Def. Supp. at 23-25. But all that is required at the class certification stage is to "allow the district court to see how it *might* satisfy Rule 65(d)'s constraints." *Shook v. Bd. of Cty. Comm'rs of Cty of El Paso*, 543 F.3d 597, 605 n.4 (10th Cir. 2008) (emphasis added); *Processed Egg Prods.*, 312 F.R.D. at 170 (certification motion should allow court to "conceive of an injunction that would satisfy Rule 65(d)'s requirements."). "[T]his is not to say that plaintiffs are required to come forward with an injunction that satisfies Rule 65(d) with exacting precision at the class certification stage. If anything, the degree of specificity with which plaintiffs must describe the injunctive relief requested becomes more exacting as the litigation progresses."[66] *Shook*, 543 F.3d at 605 n.4; *see also Yates v. Collier*, 868 F.3d 354, 368 (5th Cir. 2017) ("Rule 23(b)(2) does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage; it requires only 'reasonable detail.'").[67]

In addition, the anticompetitive conduct detailed in Plaintiffs' briefing provides reasonably particular detail for this Court to conceive of a final injunction order. Plaintiffs even have provided specific examples of injunctive relief, explaining that all class members would benefit from an order requiring Celgene to delist its REMS patents from the Orange Book or supply samples to generic companies within 30 days of request. Celgene's list of grievances regarding the propriety of these

---

[65] Plaintiffs' opening brief listed the relevant antitrust issues, and this Court recognized that the Rule 23(a)(2) commonality requirement was satisfied. Pls' Supp. at 27-28; Op. at 15-16.

[66] Comparing actual injunction orders to class certification orders reveals why Celgene's argument does not translate in practice. *See* Appendix A.

[67] *See also S.R., by & through Rosenbauer v. Pa. Dep't of Human Servs.*, 325 F.R.D. 103, 112 (M.D. Pa. 2018) ("Though we agree [] that, if Plaintiffs are successful, they will need to propose, and the Court would need to fashion, a specific injunction that gives fair notice to Defendants as to what conduct will violate the order, and such construction will be difficult, we disagree that such an injunction is impossible and find that the requirements of Rule 23(b)(2) are satisfied.").

18

examples is premature. Def. Supp. at 24. At an appropriate future stage of this case, the parties will have an opportunity to litigate Plaintiffs' Clayton Act claim and Celgene's corresponding defenses. Following a ruling that establishes the scope of Celgene's unlawful conduct, this Court will be able to craft appropriate injunctive relief.[68] The terms of that injunction are "conceivable" at this stage.

### 2. The Proposed Injunction Class is Cohesive

In challenging the cohesiveness of the class, Celgene merely incorporates its arguments on the damages classes by reference. Def. Supp. at 27. But Celgene's expert has testified ███ that his opinions on common proof do not extend to the Injunction Class.[69] Moreover, Celgene concedes that *Laumann*'s discussion of universal injury from lack of choice applies at a minimum to the injunction class. Def. Supp. at 20. *Laumann* found the (b)(2) class cohesive, because all consumers "suffer[ed] the same ongoing injury" of diminished choice and elevated prices "regardless of what motivates a consumer to decide not to purchase a particular product." 105 F. Supp. 3d at 409-10. Here, too, all class members are injured by the lack of a generic alternative, and injunctive relief providing an avenue for generic entry would redress the injuries suffered by *all* class members.[70]

### 3. Classwide Relief Would Provide a Meaningful Benefit to Class Members

Celgene argues that the Injunction Class should not be certified because "there would be no

---

[68] 

[69] Hughes 2018 Dep. at 47:23-48:1; ██████████████████

[70] The cases Celgene cites are similarly unavailing, because the injunctions there would not provide relief to all class members. *See Gates v. Rohm & Haas Co.*, 655 F.3d 255, 265-69 (3d Cir. 2011); *Kotsur v. Goodman Glob., Inc.*, 2016 WL 4430609, *9 n.10 (E.D. Pa. Aug. 22, 2016); *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 635-36 (W.D. Wash. 2011).

meaningful additional benefit to prospective class members in ordering classwide relief." Def. Supp.

at 28. Although "the Third Circuit has advised that courts *may* consider whether class-wide

treatment is necessary to obtain injunctive relief," *Id.* (citing *Gayle v. Warden Monmouth Cty. Corr. Inst.*,

838 F.3d 297, 310 (3d Cir. 2016)) (emphasis added), Celgene omits critical qualifying language in

*Gayle* that "necessity is *not* a freestanding requirement justifying the denial of class certification . . . it

may be considered to the extent it is relevant to the enumerated Rule 23 criteria." *Id.* (emphasis

added). Indeed, *Gayle* found the district court erred in denying class certification solely on necessity

grounds, since "necessity is not an express requirement of Rule 23," and "[t]he circumstances in

which classwide relief offers no further benefit [] will be rare, and courts should exercise great

caution before denying class certification on that basis." *Id.* at 308, 310.[71]

An antitrust case where the defendant continues to monopolize the market for expensive

cancer medication is certainly not the rare case where injunctive relief offers no added benefit. The

consequences of not certifying a class can be significant for those who would otherwise benefit from

the relief afforded by Rule 23(b)(2). "Where class certification is denied on the ground of necessity,

yet would-be class members continue to be subjected to injury, their only option may be to

undertake the expense, burden, and risk of instituting their own litigation—barriers that in many

cases will be prohibitive." *Id.* at 311.[72] Thus, the Injunction Class should be certified.

## III.   CONCLUSION

Based on the foregoing and in the interest of justice, Plaintiffs' motion should be granted.

---

[71] Celgene's citation to *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018), in which the "sole common question . . . was not justiciable" has no application here.

[72] Indeed, "if class relief will require nothing more of [Celgene] than the relief sought by the individual plaintiffs, one wonders why [Celgene] opposes class certification so vigorously . . . certification will work to [Celgene's] benefit if they should prevail. A judgment in their favor would bind class members who might otherwise commence a new action challenging the practices at issue here." *Montes v. Brezenoff*, 85 F.R.D. 130, 132 (S.D.N.Y. 1980).

Dated: February 15, 2019    By:   _Melinda R. Coolidge_

Melinda R. Coolidge
Walter D. Kelley, Jr.
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200
mcoolidge@hausfeld.com
wkelley@hausfeld.com

Brent W. Landau
Katie R. Beran
Tamara Freilich
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
(215) 985-3270
blandau@hausfeld.com
kberan@hausfeld.com
tfreilich@hausfeld.com

Whitney E. Street
**BLOCK & LEVITON LLP**
610 16th Street, Suite 214
Oakland, CA 94612
(415) 968-1852
wstreet@blockesq.com

Stephen Teti
**BLOCK & LEVITON LLP**
155 Federal Street, Suite 400
Boston, MA 02110
(617) 398-5600
steti@blockesq.com

Frank R. Schirripa
Daniel B. Rehns
John A. Blyth
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Avenue, 10th Floor
New York, NY 10016
(212) 213-8311
fschirripa@hrsclaw.com
drehns@hrsclaw.com
jblyth@hrsclaw.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed
Classes*

21

James Notis
Jennifer Sarnelli
**GARDY & NOTIS, LLP**
560 Sylvan Avenue
Englewood Cliffs, NJ 07632
jnotis@gardylaw.com
jsarnelli@gardylaw.com

Jeffrey A. Barrack
Jeffrey B. Gittleman
**BARRACK, RODOS & BACINE**
330 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
jgittleman@barrack.com

Todd A. Seaver
Christopher T. Heffelfinger
**BERMAN TABACCO**
44 Montgomery Street
Suite 650
San Francisco, CA 94104
(415) 433-3200
tseaver@bermantabacco.com

*Additional Plaintiffs' Counsel*